INDIANA DEPARTMENT OF ENVI-RONMENTAL MANAGEMENT and Midwest Medical Solutions, LLC, Appellants–Respondents,

v.

LAKE COUNTY SOLID WASTE MANAGEMENT DISTRICT, Appellee–Petitioner.

No. 45A04–0507–CV–398.

Court of Appeals of Indiana.

May 19, 2006.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, for Appellant Indiana Department of Environmental Management.

Richard VanRheenen, George T. Patton, Jr., Bryan H. Babb, Bose McKinney & Evans, Indianapolis, for Appellant Midwest Medical Solutions, LLC.

Kenneth D. Reed, Abrahamson, Reed and Bilse, Hammond, Clifford E. Duggan, Jr., Lake County Solid Waste, Management District, Merrillville, for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

The Indiana Department of Environmental Management ("IDEM") and Midwest Medical Solutions, LLC ("Midwest"), appeal the trial court's reversal of a judgment of the Office of Environmental Adjudication ("OEA") in favor of IDEM and Midwest and adverse to the Lake County Solid Waste Management District (the "District").[1] We reverse.

### Issues

IDEM and Midwest raise three issues:

I. Whether the trial court erred in reversing the OEA's judgment and concluding that IDEM must wait on a local waste management district to decide whether there is a "local" need for a waste processing facility before IDEM can issue a facility permit;

II. Whether the trial court erred in ordering Midwest to appear before the District and submit materials to demonstrate that a "local need" exists for its permitted and operating medical waste processing facility; and

---

1. On April 26, 2006, we heard oral argument on this matter. We commend counsel for their well-prepared presentations, which assisted us in our deliberations.

III. Whether the trial court erred in determining that Midwest had not demonstrated a "local need" for a solid waste facility when this fact-based issue was never before the OEA.

**Facts and Procedural History**

Midwest is an Indiana limited liability company in the business of collecting, processing, and disposing of infectious waste in Gary, Indiana. Appendix at 10. The District, a political subdivision created by statute, has numerous powers,[2] including making solid waste policy at the local level. *Id.* (citing Ind.Code § 13–21–3–1).

In a March 5, 2001 letter to Jeffrey Langbehn, executive director of the District, Midwest's counsel inquired whether the District would support Midwest's application for a solid waste processing facility permit. *Id.* at 424. In particular, Midwest asked for the District's "concurrence that there is a local or regional need for its proposed autoclave." *Id.* Midwest enclosed a suggested letter to IDEM that the District could sign. *Id.* at 427–29. The District did not respond to Midwest's request.[3]

Approximately seven months later, on October 9, 2001, Midwest applied to IDEM for a permit. *Id.* at 16. As part of its application, Midwest submitted to IDEM information to demonstrate a local or regional need for the proposed facility. In particular, Midwest represented that at the time of its application,[4] only two commercially available medical waste treatment facilities existed in Indiana, both of which were in Indianapolis, and one of which was operating at capacity. *Id.* at 1060.

From the date of Midwest's original permit application through September 17, 2003, the permitting process was continued, suspended, and/or extended either by requests for additional information ("RAI") from IDEM or by agreement between Midwest and IDEM. *Id.* at 16. Within that time period, the District was given notice of every RAI issued by IDEM to Midwest, including an RAI that requested Midwest to provide additional information demonstrating a need for its facility. *Id.* at 461–88. The District remained uninvolved, providing no input and asking no questions.

On September 17, 2003, IDEM denied Midwest's permit application, finding that Midwest did not have proper zoning approval. *Id.* at 17. On October 3, 2003, Midwest petitioned for administrative review of IDEM's permit denial. On December 19, 2003, IDEM received notice that the City of Gary and Midwest had settled their zoning dispute. *Id.* at 16. Accordingly, on January 13, 2004, IDEM and Midwest entered into an agreed order, which reinstated Midwest's permitting process and stated that the "schedules for determinations on permits contained in Indiana Code 13–15–4 will not be applicable to IDEM's continued review of the Permit Application." *Id.* at 16, 587–90. Also in January 2004, Anthony Portone, a representative from a company called Abrade, contacted the District and indicat-

---

2. *See* Ind.Code § 13–21–3–12.

3. Oddly, the District later cited Midwest's March 5, 2001 letter to support the following assertion: "Although Midwest did initially indicate an intention to come before the District Board in March of 2001, Midwest never requested to be on the District agenda or that the District readdress the need for such a facility." Appellee's Br. at 14.

4. Since that time, the two Marion County facilities have ceased operations, hence leaving Midwest as the only facility of its kind in Indiana. App. at 1185.

ed that he too "wanted his chance to become a medical waste processor, in the event that the district would find a need." *Id.* at 717.

Between January 30 and March 7, 2004, IDEM held a public comment period, which provided interested parties with the opportunity to make written and oral technical comments regarding changes and additions to Midwest's permit application. *Id.* at 569, 593. On February 4, 2004, Langbehn sent a letter to IDEM stating that the District Board had "voted to become active and involved in making a needs determination for medical waste processing facilities within the District" and that it planned to "publish a notice to any and all individuals who have an interest in constructing such a facility in Lake County, Indiana." *Id.* at 569, 594. The February 4 letter continued:

> The District Board further intends to examine any and all information relevant, arrive at findings of fact, and forward a recommendation to IDEM as to the District's need for such a facility, or lack thereof. Therefore, the District Board respectfully requests that IDEM suspend any current or future applications for a medical waste processing facility in Lake County, Indiana until the District Board has made its determination accordingly.

*Id.* at 594.[5]

In its "Response to Public Comments," IDEM replied to the District's comment:

> IDEM is required to process permit applications in accordance with specific timeframes in the statute and does not have the authority to suspend the review *based on the subject request.* IDEM also does not have the authority to in-

corporate permit conditions that are outside its regulatory authority and must make decisions based on the facts that are presented at the time of the decision.

*Id.* at 593 (emphasis added). The Response also contained the following reply to a comment that the facility was "not needed, particularly in light of local hospitals like Methodist Hospital with their own autoclaves, and thus does not meet the needs requirements found at IC 13–20–1 and 329 IAC 11–9–5":

> IDEM reviewed the information provided concerning needs and determined that while some medical facilities treat their own infectious waste on-site, there are a significant number of medical facilities that rely on commercial disposal of their infectious waste. IDEM has made a determination that the facility meets the demonstration of need criteria found at IC 13–20–1 and 329 IAC 11–9–5.

*Id.*

Prior to its January 2004 board meeting during which it voted "to become involved in the needs determination for medical processing facilities, the District had not taken any steps to perform a needs determination for medical processing facilities." *Id.* at 491–92 (District's response to request for admission). Portone's January 2004 contact with the District on Abrade's behalf seems to have spurred the District's involvement. *Id.* at 718 (deposition of Langbehn).

In a letter dated April 5, 2004, Midwest's counsel noted that the District had left a voice mail message inviting Midwest to make a presentation at the District's April meeting. *Id.* at 595. Midwest re-

---

**5.** On appeal, the District notes, "IDEM had previously asserted the authority to suspend its review of the Midwest permit numerous times when IDEM found the permit applica-

tion to be incomplete." Appellee's Br. at 12 (citing App. at 587, which lists the various times when IDEM and Midwest agreed to extend the deadlines).

quested additional information about the invitation, specifically, the type of presentation expected, the purpose of the presentation, the amount of time permitted, the name(s) of other companies to which an invitation had also been extended, etc. On April 16, 2004, Midwest's counsel sent another letter to the District, this one memorializing the fact that the District's counsel had since left a voice mail message indicating that the District "would be sending a letter that would go into detail regarding what the [District] was looking for in the way of a presentation." *Id.* at 596. However, the District never sent a letter to Midwest outlining details or guidance about the presentation, and the District's counsel did not at anytime thereafter "formulate" what he was looking for in the presentations. *Id.* at 708 (District's counsel's deposition).

On May 7, 2004, IDEM issued to Midwest a permit to build and operate a facility to treat infectious medical waste. *Id.* at 865. On May 25, 2004, the District filed with the OEA a petition ("Petition") for adjudicatory hearing, administrative review, and stay. *Id.* at 150–65. In the Petition, the District challenged IDEM's issuance of the permit to Midwest as arbitrary, capricious, and an abuse of discretion and otherwise not in accordance with the law "because it is contrary to Ind.Code §§ 13–20–1, 13–21 and 329 IAC 11–9." *Id.* at 151. In particular, the District alleged it "has not made [a] determination of whether there is a need for the facility as required by Ind.Code §§ 13–20–1, 13–21 and 329 IAC 11–9–5. By issuing the Permit without the [District] determining there is a need for the facility, the Commissioner has usurped the authority of the [District]." *Id.* The District later admitted that it "has not alleged that there is a

lack of need for the [Midwest] facility," and that it "has not alleged that there is such a need." *Id.* at 491 (responses to request for admission).

In an October 26, 2004 order, Environmental Law Judge Catherine Gibbs ("ELJ") of the OEA granted the motion for summary judgment filed by IDEM and Midwest against the District and denied the motion for summary judgment filed by the District against IDEM and Midwest.[6] In doing so, the ELJ made the following relevant conclusions of law:

8. It is very clear from the above mentioned statutes and rules that the IDEM, not the local solid waste management district, has the authority and the duty to make the determination of whether there is a need for a solid waste facility in the district.

9. This Court concludes that the legislature did not intend to give solid waste management districts the authority to stop or delay the permitting process while the district makes a determination regarding the need for a facility. The Court reaches this conclusion based on the following:

a. The statute does not explicitly set out such authority.

b. The statute does not require the solid waste management district to make determinations of need. A solid waste management district must adopt a district solid waste management plan that contains, amongst other provisions, a *projection* of the need for facilities. IC 13–21–5–11(5).

c. IC 13–21–3–14(a)(5) states that a district does not have "the power to issue permits for an activity that is already permitted by a state agency,

---

6. That order also granted motions for summary judgment filed by IDEM and Midwest

against other parties not part of the current appeal. App. at 847.

except as expressly granted by statute."

10. Pursuant to 329 IAC 11-9-5(b)(3)(A), the IDEM should consider whether a solid waste management district has made a projection of the need for a facility, if one has been made; however, there is no statutory or regulatory authority for the idea that such a projection is controlling on the IDEM.

11. The District admits that the IDEM could overrule a district's projection in certain circumstances. *See* [District's] Reply to [IDEM's and Midwest's] Responses to [District's] Motion for Summary Judgment, p. 5.

12. This conclusion does not negate the District's purpose for existence. The District clearly has a role in helping the IDEM determine whether a need exists. The District can, for example, submit comments to the IDEM during the public comment period. Also, the District clearly has other duties and responsibilities under IC 13-21-5 in addition to projecting the needs of the district.

13. The rules of statutory construction state, "If a statute is subject to interpretation, our main objectives are to determine, effect, and implement the intent of the legislature in such a manner so as to prevent absurdity and hardship and to favor public convenience." *State v. Evans*, 790 N.E.2d 558, 560 (Ind.Ct.App. 2003) [vacated on other grounds by 810 N.E.2d 335 (Ind.2004)]. The Court does not agree with the District's interpretation. Such an interpretation would result in absurd consequences. For example, if the IDEM determined that there was a need for a single type of solid waste facility for a region of the state, then one district within that region could defeat that need by asserting that it has made no such determination. One district could impose its determination of need upon other parts of the state, outside of the district boundaries. There is no indication that this was the Legislature's intent.

14. The IDEM must make decisions regarding permits within a certain time frame in accordance with IC 13-15-4. Adopting the District's argument that the IDEM has to wait until a solid waste management district makes a determination of need could result in a delay in issuing the permit. IC 13-15-4-11 lists the options that a permit applicant has in this instance. There is no indication in the language of the statute that it was the Legislature's intent to allow a solid waste management district to delay the permitting process.

15. Pursuant to IC 13-15-4-10, the time frame for issuing a permit can only be suspended for certain reasons. These reasons do not include waiting for a solid waste management district to make a determination of need. If, as the District argues, the IDEM must wait until the local solid waste management district makes a determination, the permitting process could be delayed interminably. This is particularly compelling in this case as the District waited almost 2½ years after learning of Midwest's application to tell the IDEM that it wanted to make the determination of need.

*Id.* at 844-45.

On November 22, 2004, the District petitioned for review of the OEA decision in the Lake Superior Court. The District contended that it was

aggrieved and adversely affected by IDEM's action, in that 1) IDEM's action has prejudiced the interests of the District, 2) the District is required to make a determination of need as part of IDEM's administrative review and IDEM denied the District that ability, 3)

the District's asserted interests are among those IDEM was required to consider when the agency engaged in its permit review, and 4) a judgment in favor of the District would substantially eliminate and redress the prejudice to the District cause by IDEM's action;

. . . .

[The District] is prejudiced by one or more of the grounds described in section 14 of IC 4–21.5–5 in this matter because [the District] is the agency designated by statute and regulations for determining the solid waste needs within the Lake County Solid Waste Management District and has an approved district plan under IC 13–21–5, but the Commissioner, IDEM has approved construction of a solid waste facility in Lake County without the [District] having made a determination of need for the facility, and said approval is deficient as to need.

*Id.* at 35–36. The District requested, *inter alia,* that IDEM's approval of the permit be vacated and that the matter be remanded to IDEM for further review, including "a determination of need for such a facility by the District[.]" *Id.* at 37. The District did not allege a lack of need for a medical waste processing facility in Lake County. On November 29, 2004, the District filed a verified petition asking the trial court to stay IDEM's approval of Midwest's permit. *Id.* at 39–53.

In January 2005, consistent with its permit, Midwest began treating medical waste with its autoclaves and disinfecting re-usable sharps containers in its facility in Gary, Indiana. *Id.* at 1184. "The autoclaves disinfect medical waste by subjecting it to steam heat and pressure to kill germs that make the waste infectious. This is the same technology a dentist uses to sterilize dental instruments. The disinfected waste is taken to a landfill" in Newton County as authorized by Midwest's permit and the

landfill. *Id.* at 1183–84. No waste is disposed of in Lake County. *Id.* "The Sharps management system consists of a robotic wash machine that unlocks and dumps the contents of proprietary re-usable sharps containers and washes and disinfects the empty containers. The dumped sharps are disinfected in one of the autoclaves to render them non-infectious" and taken to the Newton County landfill with the other treated medical waste. *Id.* at 1184. Also in January 2005, Midwest and IDEM each filed an answer and affirmative defenses to the District's stay request.

On March 9, 2005, Midwest filed its motion for summary judgment and accompanying materials. One week later, the District filed its trial brief in support of its petitions for review and for stay. Also on March 16, 2005, the court held a hearing during which the parties argued their positions regarding both the stay and Midwest's summary judgment motion. Tr. at 3–54. On March 23, 2005, Midwest filed its response to the District's trial brief in support of its petitions for review and for stay. App. at 1027–51. On March 28, 2005, the court issued an order staying IDEM's approval of Midwest's permit, but not "interdict[ing] the operation of its facility in Gary, Indiana, pending disposition of the ultimate issues on the merits[.]" *Id.* at 1054–58.

On April 20, 2005, IDEM filed its "Position on the Issue Raised in Midwest's Motion for Summary Judgment." *Id.* at 1059–62. Thereafter, the District filed its "Opposition" to Midwest's summary judgment motion, its response to IDEM's "Position," and its supplemental designation of evidence. *Id.* at 1063–93, 1105–20. On April 27, 2005, Midwest filed its reply to the District's "Opposition." *Id.* at 1094–1104.

On June 3, 2005, argument was held regarding the motions for summary judg-

ment. Tr. at 55–79. Thereafter, both Midwest and the District submitted proposed orders to the trial court. On June 23, 2005, the court entered a twenty-six-page final order adopting in large part the District's proposed order, reversing the OEA's decision, and granting summary judgment in favor of the District. App. at 8–33. Below, we set out two of the 103 numbered paragraphs as well as the judgment portion of the final order:

29. While the statute is clear that a description of the need identified in the district solid waste management plan is required as part of the permit application and in IDEM's review and permit action, it is important to note that this requirement does not just impose that duty on the District to initiate its determination of need. It is also the permit applicant's responsibility, in following the statutory permit requirements, to initiate and pursue such a determination by the District. Although Midwest did initially indicate an intention to come before the District Board in March of 2001, Midwest never requested to be on the District agenda or that the District readdress the need for such a facility....

49. IDEM does not approach nor involve any District regarding the needs determination by a District....

### JUDGMENT

....

IDEM's approval of the permit described herein is hereby vacated and declared void. The matter is remanded back to IDEM for further review, which review shall include the District's determination of need relative to this type of facility and related action thereto. However, the Court chooses not to prohibit the operation of Midwest's facility in Gary, Indiana, for a period of 30 days, pending submission by Midwest to the District for determination of need for such facility, participation by Midwest in the determination of need by the District, and any resultant modification of the District plan as a result of the District review and action. To do so recognizes that Midwest's activities were in reliance on IDEM's invalid and illegal action and provides the opportunity for an expedited resolution of this permit application.

*Id.* at 18, 21, 33.

Toward the end of June 2005, Midwest filed its notice of appeal and then an amended notice of appeal. On July 18, 2005, Midwest filed with this Court a motion to stay injunctive relief pending appeal. *Id.* at 1171–1206. On July 20, 2005, the trial court issued an order clarifying that the temporary stay of enforcement would remain in effect until the hearing regarding Midwest's motion to for stay, which was scheduled for August 26, 2005. On July 22, 2005, a panel of this Court denied Midwest's motion for stay, noting that the trial court's clarification order made the motion before the Court of Appeals premature. This Court went on to explain that while the trial court might eventually deny Midwest's motion for stay, any motion for stay filed before the trial court makes such a ruling premature. Hereinafter, where appropriate, we shall refer to Midwest and IDEM collectively as "Appellants."

### Discussion and Decision

#### Standard of Review

■ Although stated somewhat differently, the standards of review proffered by the parties are not inconsistent. A trial court's order on summary judgment is cloaked with a presumption of validity; the party appealing from a grant of summary judgment must bear the burden of per-

suading this Court that the decision was erroneous; and this Court shall affirm an order for summary judgment where sustainable on any legal theory or basis in the record. *Indianapolis Downs, LLC v. Herr,* 834 N.E.2d 699 (Ind.Ct.App.2005), *trans. denied,* Ind. Trial Rule 56, and *Gorski v. Deering,* 465 N.E.2d 759, 761 (Ind. Ct.App.1984).

▮▮▮ Given the above, we have additional considerations where, as here, an agency is involved. That is, "[w]hen this Court reviews the decision of an administrative agency under the Administrative Orders and Procedures Act, it applies the same standard of review as the trial court." *Andrianova v. Ind. Family & Soc. Servs. Admin.,* 799 N.E.2d 5, 7 (Ind. Ct.App.2003). We may not try the case de novo, reweigh evidence, or substitute our judgment for that of the agency. *Fam. Dev., Ltd. v. Steuben County Waste Watchers, Inc.,* 749 N.E.2d 1243, 1256 (Ind.Ct.App.2001). Deference is to be given by the reviewing court to the expertise of the administrative body, and the decision should be reversed only if it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to a constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. *Ind. Dep't of Envtl. Mgmt. v. Schnippel Constr., Inc.,* 778 N.E.2d 407, 412 (Ind.Ct.App.2002) (quoting Ind.Code § 4–21.5–5–14(d)(1)–(5)), *trans. denied.* "A decision is arbitrary and capricious when it is made without any consideration of the facts and lacks any basis that may lead a reasonable person to make the same decision made by the administrative agency." *Id.*

▮▮▮ We apply de novo review to questions of law, hence we owe no deference to the trial court on such inquiries. *See Kiel Bros. Oil Co. v. Ind. Dep't of Envtl. Mgmt.,* 819 N.E.2d 892, 902 (Ind. Ct.App.2004), *trans. denied.* "When an ordinance is subject to different interpretations, the interpretation chosen by the administrative agency charged with the duty of enforcing the ordinance is entitled to great weight, unless that interpretation is inconsistent with the ordinance itself." *Hoosier Outdoor Adver. Corp. v. RBL Mgmt., Inc.,* 844 N.E.2d 157, 163 (Ind.Ct. App.2006). Moreover, when a court determines that an administrative agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's interpretation. *Id.* "Terminating the analysis reinforces the policies of acknowledging the expertise of agencies empowered to interpret and enforce ordinances and increasing public reliance on agency interpretations." *Id.; see also Ind. Dep't of Envtl. Mgmt. v. Boone County Resource Recovery Sys., Inc.,* 803 N.E.2d 267, 273 (Ind.Ct.App.2004), *trans. denied.*

▮▮▮ Finally, we acknowledge that the trial court "adopted verbatim (with minor formatting changes)" the District's proposed findings and conclusions. Appellants' Br. at 22 (citing App. at 8–33 (trial court's order) and App. at 1123–53 (the District's proposed summary judgment order)). "Although it is not prohibited to adopt a party's proposed order verbatim, this practice weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court." *See Safety Nat'l Cas. Co. v. Cinergy Corp.,* 829 N.E.2d 986, 993 n. 6 (Ind.Ct. App.2005) (citing *Cook v. Whitsell–Sherman,* 796 N.E.2d 271, 273 n. 1 (Ind.2003)), *trans. denied.*

## I. Must IDEM Wait for the District's Determination of Need?

 In asserting that IDEM lawfully issued the operating permit to Midwest, Appellants argue that the plain language of the statutory and regulatory scheme does not require IDEM to suspend review of an application indefinitely if/when a district indicates its wish to determine need. Appellants maintain that the District's actions, in waiting almost two and one-half years after learning of Midwest's application to inform IDEM that it wanted to make the determination of need, exemplifies the wisdom of the legislation. *See* Appellants' Br. at 19.

The District's argument[7] may be summarized as follows. The legislature designated the District as the appropriate agency to determine the solid waste needs within the District. Pursuant to Indiana Code 13–21–5, the District made a district solid waste management plan, which required a determination of need for a facility. Despite approving the District's plan, IDEM permitted construction of Midwest's facility without the District having first made a determination of need for the facility.

This appeal involves the interplay between, responsibilities of, and limitations on districts, IDEM, the State Solid Waste Board, and zoning authority with regard to permits. In analyzing this issue, we begin with the relevant statutory and administrative law. According to our legislature,

[t]he solid waste management board shall establish requirements for the issuance of permits to control solid waste, hazardous waste, and atomic radiation,

including the following: ... (2) Permits for the *construction,* installation, or modification *of facilities,* equipment, or devices: ... (B) *for* the storage, *treatment, processing,* transferring, *or disposal of solid waste* or hazardous waste.

Ind.Code § 13–15–1–3 (emphases added); *see also* Ind.Code § 13–20–1–5 ("The solid waste management board shall adopt rules under IC 4–22–2 to implement this chapter."). As per this directive, the State Solid Waste Board[8] promulgated the following:

(a) This section applies to all permits for new solid waste facilities or major modifications of permits issued after March 20, 1990, except those facilities exempt under IC 13–20–1–1.

(b) In accordance with subsection (a), and in addition to other permit application requirements outlined in this rule, the following are also required:

(1) A description of the anticipated area that would be served by the facility as indicated by the following:

(A) Solid waste management district or districts if established.

(B) County, counties, or portions thereof.

(C) County, counties, and state if the area includes portions outside of Indiana.

(2) A description of the existing solid waste management facilities that serve the same described area.

(3) A description of the need that would be fulfilled by constructing the proposed facility as follows:

---

7. Without explanation, the District titles its arguments: "Propositions." For example, its response to Appellants' first issue is found under the heading, "Proposition I." Appellee's Br. at 19.

8. The State Solid Waste Board is an independent board that consists of fourteen members, including an appointed representative of environmental interests. *See* Ind.Code §§ 13–19–2–1 and –2.

(A) *For facilities proposed in areas with approved district solid waste management plans, a description of the need identified in the district solid waste management plan required under IC 13–21–5.*

(B) For facilities proposed in areas without approved district solid waste management plans, a description of need for the proposed area to be served.

(4) A description of recycling, composting, or other activities that the facility would operate within the proposed area of service.

(5) Additional information as requested by the commissioner.

(c) *The commissioner shall review the submitted application and accompanying materials in accordance with this rule. If it is determined that there is not a local or regional need in Indiana for the solid waste management facility, the commissioner shall deny the permit application.*

Ind. Admin. Code tit. 329, r. 11–9–5 (emphases added).

"Each district shall adopt and submit to [IDEM] for approval a district solid waste management plan that meets: (1) the requirements of this chapter; and (2) the criteria and other elements set forth in the state plan." Ind.Code § 13–21–5–1. Pursuant to statute, a district plan *must* include the following:

(1) The results of a demographic study of the district predicting the population of the district:

(A) five (5) years;

(B) ten (10) years; and

(C) twenty (20) years;

after the year the district plan is adopted.

(2) A:

(A) description of the origin, content, and weight or volume of the solid waste to be generated in the district at the time of the development of the district plan; and

(B) projection of the origin, content, and weight or volume of the solid waste to be generated in the district:

(i) five (5) years;

(ii) ten (10) years; and

(iii) twenty (20) years;

after the year the district plan is adopted.

(3) An inventory and description of the following:

(A) The facilities located within the district.

(B) The solid waste management activities taking place within the district.

(4) A statement identifying and assessing solid waste problems that:

(A) exist in the district at the time of the development of the district plan; and

(B) may exist in the district in the future.

(5) A:

(A) projection of the need for; and

(B) description of;

facilities in the district five (5) years, ten (10) years, and twenty (20) years after the year the district plan is adopted. Ind.Code § 13–21–5–11.

"A person that applies for a permit described in IC 13–15–1–3 that concerns a solid waste management facility must demonstrate that there is a *local or regional need in Indiana for the facility.*" Ind. Code § 13–20–1–2 (emphasis added).[9]

9. Indiana Code Section 13–20–1–2 was amended in 2005 to read as follows: "A person that applies for a permit for a solid waste disposal facility or a solid waste processing

When applying for a permit referred to in Section 13–20–1–2, a person "must" submit the following information to IDEM along with the permit application:

(1) A description of the area that would be served by the solid waste management facility.

(2) A description of existing solid waste management facilities in the area that would be served by the solid waste management facility.

(3) A description of the need that would be fulfilled by constructing the solid waste management facility.

Ind.Code § 13–20–1–3 (entitled "Demonstration statement").[10]

If [IDEM] determines that there is not a *local or regional need in Indiana* for the solid waste management facility, the person referred to in [Ind.Code § 13–20–1–2] may not receive a permit described under Ind.Code § 13–15–1–3 of this chapter. If a permit is denied under this subsection, [IDEM] must provide the person referred to in [Ind.Code § 13–20–1–2] with a statement describing the reasons [IDEM] denied the permit.

Ind.Code § 13–20–1–4 (emphasis added).[11]

While our research has revealed no case law that adequately explains the relationship between the local and state authorities under the particular circumstances presented here, we have found guidance in cases involving somewhat similar scenarios. For instance, in a recent case concerning a landfill (rather than an infectious medical waste facility), we explained:

Local district plans are subject to approval by the Commissioner of [IDEM]. Ind.Code § 13–21–5–8 and –9.

It is clear that county solid waste management districts are an *integral part of the overall state system for addressing, among other things, solid waste management and disposal.* They are charged with assessing the needs of their respective districts and there is nothing that conflicts with the permitting function of IDEM in a county district determining if there is a need for a landfill in the district. One of the things that must be demonstrated to [IDEM] is that there is a local or regional need for a proposed landfill. Ind.Code § 13–20–1–2. Consequently, it is not unreasonable for the zoning authority to require a needs assessment from the county solid waste management district before going further in its consideration of an application for a special exception to locate a landfill in its jurisdiction.

*Bd. of Comm'rs of LaPorte County v. Town & Country Utils., Inc.,* 791 N.E.2d 249, 257 (Ind.Ct.App.2003) (emphasis added), *trans. denied.* Notably, in the present case, any zoning issues that may have existed were resolved prior to IDEM granting the permit to Midwest.

In a case concerning a district's permitting of a long-term clean fill processing and organic recycling facility, our supreme court stated:

The statute creating and governing Districts specifically grants authority to regulate solid waste, I.C. § 13–21–3–12, and calls for the *districts to collaborate with IDEM to deal with solid waste*

facility, except for a transfer station, must demonstrate that there is a local or regional need in Indiana for the facility."

**10.** Indiana Code Section 13–20–1–3 was also amended in 2005. Although basically the same as the former version, the new version

replaces some references of solid waste "management facilities" with solid waste "disposal" and/or "processing" facility.

**11.** The 2005 amendment to this section changed "management" to "disposal."

*issues.* *See* I.C. § 13–21–5–1 ("Each district shall adopt and submit to the [IDEM] commissioner for approval a district solid waste management plan."). If the Home Rule Act precluded solid waste management districts from regulating this conduct because IDEM regulates the conduct, then there would be no purpose to solid waste management districts at all.

*Worman Enter., Inc. v. Boone Co. Solid Waste Mgmt. Dist.*, 805 N.E.2d 369, 374 (Ind.2004) (emphasis added). In that same opinion, it was also noted that as of July 1, 2003, "the powers of a district do not include . . . [t]he power to issue permits for an activity that is already permitted by a state agency, except as provided by statute." *Id.* at 374 n. 1 (citing Ind. Code § 13–21–3–14(a)(5)). The effects of Section 13–21–3–14(a)(5) have yet to be analyzed. *Id.*[12]

█ What we glean from *LaPorte, Worman,* and the relevant statutory and administrative Code provisions is that districts play a vital role in addressing, regulating, and generally "deal[ing] with" solid waste management issues. *LaPorte,* 791 N.E.2d at 257. That said, districts do not operate in a vacuum, but rather function as a "part of the overall state system." *Id.* Under that state system, districts perform certain duties subject to IDEM's oversight. Specifically, a district must adopt a solid waste management plan, which in turn must be submitted to and approved by IDEM. Ind.Code §§ 13–21–5–1, –8, and –9. As we explain below, the plan may at times play a part in the permitting process.

A party that wishes to construct a facility for the treatment, processing, and/or disposal of solid waste must apply for a permit and demonstrate that there is a local *or regional* need for the facility. Ind. Code § 13–15–1–3; Ind.Code § 13–20–1–2. Along with the permit application *submitted to IDEM,* the party must provide a description of: the area to be served by the facility, the existing facilities in the area, and the need that would be fulfilled. Ind.Code § 13–20–1–3. The Administrative Code elaborates on the need demonstration: "For facilities proposed in areas with approved district solid waste management plans, a description of the need identified in the district solid waste management plan required under Ind.Code 13–21–5." 329 IAC 11–9–5.

Indiana Code Section 13–21–5–11, which requires a district plan to include certain descriptions and projections, makes no explicit mention of infectious medical waste or facilities that deal with such waste. Thus, not surprisingly, the District's plan was silent regarding a current or projected local need for Midwest's facility. Accordingly, Midwest did not include in its permit application a description of a local need identified in the existing district solid waste management plan. In light of the absence of any reference to the need or lack of need for an infectious medical waste facility in the District's plan, it would be difficult to fault Midwest for not including a "description of the need identified in the district solid waste management plan[.]" *See* 329 IAC 11–9–5; *cf.* Appellee's Br. at 13 (District's argumentative "facts" section).

Faced with a district plan that contained no reference one way or another regarding a need for an infectious waste facility, Midwest contacted the District in an attempt to determine whether the Dis-

---

**12.** We note that the current version of Section 13–21–3–14(a)(5) is worded slightly differently than what appears in the *Worman* footnote. Rather than "except as provided by statute", the current version reads "except as *expressly granted* by statute." (Emphasis added.)

trict would support its permit application. The District did not respond. Upon receiving no response [13] on the local front, Midwest apparently focused on demonstrating a regional need for its proposed facility.[14] In support of its assertion of regional need within its permit application, Midwest represented that only two commercially available medical waste treatment facilities existed in Indiana, both of which were located in Indianapolis, and one of which was operating at capacity. App. at 1060, 633–40. "Midwest further showed that northern Indiana generates 5,198 tons of medical wastes for disposal each year, much of which is generated over one hundred miles from any then existing commercial infectious waste facility in Indiana." *Id.* Eventually, IDEM granted Midwest the permit it sought.[15] IDEM did not make, nor was it required to make, a specific finding of regional need when it *granted* the permit. *See* Ind.Code § 13–20–1–4 ("If a permit is *denied* under this section, the department must provide the person referred in section 2 of this chapter with a statement describing the reasons [IDEM] denied the permit.") (emphasis added). In contrast, had IDEM denied the permit, it would have been required to include explanatory findings. Indeed, IDEM did just that earlier in the process when zoning approval was unclear. App. at 17.

Indiana Code Chapter 13–20–1, 329 Indiana Administrative Code Section 11–9– 5, and Indiana Code Chapter 13–21–5 support Appellants' argument for reversal of the trial court's order. The aforementioned sections identify information that the applicant must include in its permit application materials to demonstrate need, allow IDEM to request additional information, and clearly state that IDEM (that is, the commissioner) is to review the materials and determine whether the applicant has indeed demonstrated a need for its proposed facility. A plain reading of these sections reveals no requirement that IDEM either solicit a district's local determination of need or suspend review of an application upon a district's request to perform its own determination of needs. *See Carter–McMahon v. McMahon,* 815 N.E.2d 170, 175 (Ind.Ct.App.2004) ("[I]n construing a rule, it is just as important to recognize what it does not say as it is to recognize what it does say."). To adopt the District's viewpoint to the contrary would be to rewrite the sections, as well as to render meaningless both the "or regional need" language of Indiana Code Chapter 13–20–12 and the relatively newly enacted Indiana Code Section 13–21–3– 14(a)(5).

This is not to say that a district's voice is meaningless in the permitting process. Rather, districts may play an advisory role if they so choose. In particular, nothing in the current statutory or administrative scheme would prohibit a local district from voicing its opposition to the

---

**13.** Not until the District provided answers to interrogatories was there any indication that the District may not have anticipated a need for such a facility. *See* App. at 598.

**14.** This would be consistent with IDEM's practice of not approaching a district, but "giv[ing] the [permit] applicant choices in how they proceed." App. at 762.

**15.** The District also maintains that the "IDEM employee responsible for the review of solid waste processing facility permits used 328 IAC 10–9, the landfill criteria, rather than 329 IAC 11–9, as the criteria used in his review of Midwest's permit application." Appellee's Br. at 15. However, a review of the testimony reveals that IDEM seemingly used Ind. Code § 13–20, 329 IAC 11–9–5, *and* 329 IAC 10–9. App. at 760–62. Moreover, 329 IAC 10–11–7 is virtually identical to 329 IAC 11– 9–5 except that 10–11–7 has additional analysis in its subsection (c), where 329 IAC 11–9– 5 provides no explicit guidance.

possible grant of a permit. A district would be free to timely register its own determination of need/lack thereof. IDEM could then consider such input from local districts along with the other submissions in order to arrive at its final decision. A determination of local need/lack thereof by a district would not be, however, a condition precedent to the ultimate permitting decision, which rests with IDEM.

To endorse the District's interpretation would be to create a veto-type power in local districts over regional matters and/or to leave no method for resolving conflicting need determinations among neighboring districts. Indefinite delays could result. The District's construction would also be inconsistent with the interpretation utilized by IDEM, the entity that regularly administers the permit process. The following testimony of Bruce Palin, deputy assistant commissioner for IDEM Office of Land Quality, is compelling:

Q. What happens in the situation in which you have an approved plan but the type of facility is not addressed at all in the plan?

A. Then there is nothing for the applicant to provide relevant to that situation.

Q. Does the agency seek a need determination from the district?

A. No.

Q. Does the agency require the applicant to seek a needs determination from the district?

A. No.

. . . .

Q. You have indicated that it's your opinion that if a plan is silent as to a particular entity, facility for which you receive a permit, that IDEM can make an independent determination of need based upon a needs determination, a demonstration by the applicant without regard to seeking advice or input from the district; is that correct?

A. That's correct.

Q. What do you base this interpretation on?

A. That the regulation provides the agency the authority to issue permits based on the information provided to us under the regulations; and that the regulations do not require that the sole piece of information needed for that determination is support from the solid waste district; that everything under [329 IAC] 11–9–5 is information that's provided to the agency and evaluated in making a final determination. That determination is the agency's to make.

App. at 463–64, 467–68. Palin's testimony implicitly raises yet another reason for IDEM being the ultimate statewide permitting authority: consistent application of criteria.

In concluding that a statewide permitting scheme exists and that IDEM is the ultimate decision-maker regarding local and regional need, we do not leave districts without any purpose. Rather, each district makes local solid waste general policy by adopting a solid waste management plan and by serving an advisory role in permitting. Further, according to our legislature, districts have the power to receive and disburse money, to sue and be sued, to plan, design, construct, finance, manage, own, lease, operate, and maintain facilities for solid waste management, to purchase, lease, or otherwise acquire real or personal property, or facilities, to make and contract for plans, surveys, studies, and investigations, to enter upon property to make surveys, soundings, borings, and examinations, to levy a tax, to borrow, to hire personnel, to adopt resolutions that have the force of law, to implement a household hazardous waste and conditionally exempt small quantity generator, to enter into an interlocal cooperation agreement, to compensate or reimburse, to

make grants or loans, to establish by resolution a nonreverting capital fund, to conduct promotional or educational programs, etc. *See* Ind.Code § 13–21–3–12. Accordingly, local districts have myriad duties.

## II. Must Midwest Appear Before the District and Submit Materials Demonstrating Local Need?

In their second argument, Appellants contest the trial court's order, which commands Midwest to appear before the District and submit materials to demonstrate that a local need exists for its facility, but "does not discuss a single statute, rule, or written document that would govern how such a process would take place before the District or provide Midwest with any assurance that due process would be followed." Appellants' Br. at 20, 36–37. Appellants point out that this order for injunctive relief, like the other findings and conclusions, was "proposed by the District and adopted verbatim by the trial court." *Id.* at 36. Appellants assert that neither the legislature nor the State Solid Waste Board "contemplated entities like Midwest being forced, under threat of a contempt order or of losing an operating license, to establish 'need' before a local district." *Id.* at 37. Finally, Appellants implicitly question how the District will determine need now, since when asked more than once before for guidance on the criterion, the District provided no answer. This portion of Issue II raises practicality and fairness concerns, with very little legal citation.

As should be clear from our resolution of Issue I, *supra,* Midwest will not be forced to appear before the District to demonstrate need. Appellants reference Appellate Rule 66(E), which is titled "Damages Against Appellant," in this section of their brief without developing a specific argument or making a specific request for fees. Clarification was sought during oral argument. Midwest's counsel alluded to the borderline frivolous nature of the District's position, but stopped short of making a specific request for fees.

Appellate Rule 66(E) does not provide explicit authorization for appellate attorneys fees against an *appellee. Orr v. Turco,* 512 N.E.2d 151 (Ind.1987), which was cited by Appellants' counsel during oral argument and discusses former Appellate Rule 15(G), is likewise silent regarding awarding such fees against an appellee. Given the prior uncertainty of this area of law, as demonstrated by the trial court's order that we reverse today, we would be hard-pressed to characterize the District's position as the type that would merit the imposition of fees—even if fees could be awarded against an appellee and/or had been specifically requested.

## III. Did the Trial Court Err in Determining That There Was No Local Need Demonstrated?

Appellants assert that the trial court "improperly usurped IDEM's role, sat in judgment *de novo* on whether there was a 'need' for Midwest's solid waste facility, and then substituted its determination for that of IDEM's." Appellants' Br. at 20, 38. Appellants contend that a court may not try a case *de novo* or substitute its judgment for that of an agency. In addition, Appellants contend that whether Midwest demonstrated a need before IDEM has never been an issue. That is, the District did not argue it; Appellants did not defend it; and the OEA order consequently did not address it. To the contrary, argue Appellants, in a previously filed legal document, the District admitted "that it has not alleged that there is a lack of need" for Midwest's facility. App. at 491 (response to request for admission). Accordingly, Appellants assert that principles of waiver and/or judicial estoppel provide independent reasons for reversal.

Finally, Appellants maintain that even if need was an issue, Midwest's facility is needed in light of the subsequent closings of the two Indianapolis facilities. *Id.* at 633–40, 1060, 1184–87. Midwest also reiterated the local volume problem regarding medical waste; that is, while one district may not have enough volume to justify a need for a facility, when the individual volumes of several districts are combined, the aggregate amount supports a determination of need.

Having already concluded in Issue I that reversal of the trial court's order is required, we need not address Issue III at length. However, for clarity's sake, we note that since IDEM's determination was supported, the trial court's order usurped IDEM's power by reweighing evidence. *See Boone County,* 803 N.E.2d at 271; *see also Ind. Dep't of Envtl. Mgmt. v. Chem. Waste Mgmt., Inc.,* 643 N.E.2d 331, 336 (Ind.1994) (landfill case wherein Court noted IDEM's broad power to grant or deny permits "even where it is unclear that there exist any rational means for reaching a decision."). We also agree that in failing to raise earlier the issue of whether Midwest demonstrated a need, the District waived the issue. *See Save the Valley, Inc. v. Ind.-Ky Elec. Corp.,* 820 N.E.2d 677, 679 n. 3 (Ind.Ct.App.2005) (explaining that an argument not made before the OEA deprives opposing party of opportunity to defend and thus waives the argument), *reh'g granted on other grounds by* 824 N.E.2d 776; *see also Turner v. Stuck,* 778 N.E.2d 429, 432 (Ind.Ct.App. 2002) (discussing judicial estoppel).

Reversed.

FRIEDLANDER and MAY, JJ., concur.