Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 11 2014, 9:02 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**JAMES A. FEDEROFF**
**JASON M. KUCHMAY**
Carson Boxberger LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE
ANGELA C. STUCKMAN
INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE OF
THE ESTATE:

**RICHARD K. HELM**
Rockhill, Pinnick, LLP
Warsaw, Indiana

**DOUGLAS E. JOHNSTON**
**ANGELICA N. FUELLING**
Tourkow, Crell, Rosenblatt &
Johnston, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DANIEL E. STUCKMAN, SR., and DANIEL E. STUCKMAN, JR., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| vs. | ) | No. 43A03-1403-PL-93 |
| | ) | |
| ANGELA C. STUCKMAN, as Personal Representative of the Estate of Gary A. Stuckman, deceased, and ANGELA C. STUCKMAN, KOSCIUSKO COUNTY BOARD OF ZONING APPEALS and PAPAKEECHIE PROTECTIVE ASSOCIATION | ) ) ) ) ) ) ) ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE KOSCIUSKO COUNTY COURT
The Honorable, Duane G. Huffer Judge
Cause No. 43D01-1102-PL-14

**September 11, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Daniel E. Stuckman, Sr., and Daniel E. Stuckman, Jr., (individually, Daniel Sr. and Daniel Jr., and collectively, Plaintiffs) appeal the trial court's grant of summary judgment in favor of Angela C. Stuckman, personally and as the personal representative of the Estate of Gary A. Stuckman, the Kosciusko County Board of Zoning Appeals (the BZA), and the Papakeechie Protective Association (the PPA) (collectively, Defendants) with respect to Plaintiffs' complaint for injunctive relief to compel compliance with certain restrictive covenants. Plaintiffs present the following consolidated and restated issue for appeal: Did the trial court err in granting summary judgment to the Defendants?

We affirm.

Ned and Bertha Stuckman purchased Lots A though K of the Lake Papakeechie Subdivision Number 2 by land contract in the 1950s and opened a salvage yard on Lots E through K.[1] At some point, the couple's son Gary also became involved in the salvage yard business. In 1975, a local zoning ordinance took effect, and this land was zoned residential. The existing salvage yard, however, constituted a lawful, nonconforming use. In the early 1980s, the Stuckmans cleared brush from Lots A through D and began stacking vehicles there. After complaints by area residents, the BZA brought an action for injunctive relief alleging that the Stuckmans had unlawfully expanded the salvage yard. The case eventually made its way to our Supreme Court. In its April 20, 1987 opinion, the Court concluded that the Stuckmans had violated the zoning ordinance by expanding their preexisting nonconforming use. *Stuckman v. Kosciusko Cnty. Bd. of Zoning Appeals*, 506

---

[1] See the first diagram infra.

2

N.E.2d 1079 (Ind. 1987) (the 1987 Case). In addition to this state action, the parties were involved in an ongoing federal action relating to the property.

While the 1987 Case was pending, Ned and Bertha deeded Lots A through G, except the western 150 feet of Lots B through F, to Gary on March 25, 1987. They had previously deeded the western 150 feet of Lot G to Gary in 1984. Ned and Bertha maintained their residence on the western 150 feet of Lot K. Further, the 150-foot stretch along Lots B through G were generally used as rental properties with trailer homes.

In February 1988, Ned, Bertha, Gary, the PPA, and the BZA entered into a written Compromise Agreement (the Agreement) to settle all issues concerning Lots A through K.[2] The Agreement provided that the PPA would join the Stuckmans in filing "an application for an exception for modification of a pre-existing, non-conforming use on Lots A through G…except the West one hundred fifty (150) feet thereof." *Appellants' Appendix* at 32.

The Agreement further provided in part:

4. As a part of the modification of the existing usage on Lots A though G, Stuckman shall cause to be constructed an earthen mound eight (8) feet high…, the western edge of said mound beginning one hundred eighty (180) feet from the east edge of Koher Road upon which Lots A through G front. The mound shall be graded and compacted and shall run North to South the entire frontage width of Lots A through G and shall continue East along and North of the South line of Lot G a distance of approximately Three Hundred (300) feet ending at the crest of an existing hill.
5. After the construction of such mound, Stuckman shall cause the mound to be seeded and shall plant pine trees on the mound to provide additional screening….
6. The current entryway to the salvage yard shall be maintained at its same location, but shall be widened and screened for proper ingress and egress….

---

[2] These lots are east of Koher Road, with residential lots west of the Koher Road along Lake Papakeechie.

3

7.     Stuckman shall cause to be recorded a document placing restrictive covenants on the use of Lots A through G.  That document shall contain at least the following covenants:

a.     All activity on Lots A through G, associated with the operation of a salvage yard, shall be conducted East and North of the proposed mound.

b.     The owner of the property shall cause to be maintained the evergreen plantings on the mound located on the property.

c.     Vehicles or salvage material located at the salvage yard operation shall be stacked so as not to be visible from Koher Road where it fronts on Lots A through G.

d.     The salvage yard operated on the real estate shall operate only between the hours of 8:30 A.M. and 6:30 P.M. on Monday through Sunday, however, no heavy equipment operation shall occur on Sundays.

e.     No signs shall be permitted on the site indicating the existence of the salvage yard or advertising items for sale, outside the mounded area, except such signs necessary to meet State requirements pertaining to a wrecker service.

f.     The owner of the premises shall maintain farm fencing on the West side of Lots A through G and the South side of Lot G, which fence shall be maintained in good order.  The location of the fence shall be on the perimeter of the salvage yard operation as opposed to the boundary lines of the lots proper, but shall be no closer than one hundred fifty (150) feet to the East edge of the roadway of Koher Road.

g.     The salvage operation…shall be operated in compliance with Federal, State and local rules and regulations.

h.     The covenants shall run with the land and be binding on Stuckman's heirs, successors and assigns.

i.     These covenants may be enforced by the [BZA] or the owners of any lot in Subdivision 2 of the Plat of Papakeechie after the approval of the Board of Directors of the [PPA].

*Id.* at 33-34.  An addition to the Agreement provided that the Agreement "shall have no effect on the non-conforming use of lots E through K, except the first 150 feet east of Koher Road shall remain residential.  *Id.* at 35.  The parties recorded the Agreement later that year, and there is no indication in the record that a separate document placing restrictive covenants on Lots A through G was ever filed.

4

Upon execution of the Agreement, Gary filed the request for an exception, which was approved by the BZA in 1988. Gary promptly complied with the Agreement by, among other things, installing the buffer mound and fencing. The following is the plat of the relevant area, including rough drawings of the mound and fence.



Following Ned's death, Bertha deeded Lots H through K, less the western 150 feet of Lots I and J, to their son Daniel Sr. in 1997. These lots are directly south of and adjacent to Gary's property. Bertha died in January 2006. Thereafter, in June 2007, Daniel Sr., as

5

personal representative of Bertha's estate, transferred the 150-foot strip of Lots B and C to Gary. Over the next two years, Gary obtained title to the 150-foot strip of Lots D, E, and F from various family members/owners. Accordingly, by October 2009, Gary had title to Lots A through G in their entirety.

Daniel Sr. operates a sanitation business on Lot K with his son, Daniel Jr.[3] In 2008, Daniel Sr. filed a request for an exception with the BZA, seeking approval for the construction of new buildings, installation of a scale, and relocation of driving areas. The BZA approved these modifications of his lots.

On January 30, 2010, nearly twenty-two years after the Agreement, Gary filed a request for an exception with the BZA, requesting to change and alter the salvage yard on Lots A through G. Specifically, Gary sought approval to relocate the buffer mound by moving it closer to Koher Road and to remove a number of trailer homes that existed between the mound and the road.[4] Gary also sought approval for installation of a limestone and brick sign at the entrance on Lot A, which would state "STUCKMAN'S", and a privacy fence in this area for additional screening.[5] Gary indicated in his proposal to the BZA that he believed these changes would provide improved screening of the facility for the neighbors to the west and allow for general cleanup of the area along the roadway. Gary also planned to use the added space resulting from the relocation of the mound for expanded operation of his business.

---

[3] Daniel Jr. owns parts of Lots L through Q, which are south of Daniel Sr.'s property.
[4] The plans specified that the existing house and barn on the northwest corner of Lot A would remain.
[5] Gary also sought approval of two new structures and an add-on to an existing structure for the purpose of moving several operational aspects of the business indoors. These changes are not at issue in this appeal.

6

The BZA held a hearing on Gary's petition on February 9, 2010. Plaintiffs did not appear to remonstrate. Gary, by counsel, presented the following proposed site plan.



At the conclusion of the hearing, the BZA unanimously granted Gary's request for modification of the preexisting nonconforming use. Shortly thereafter, Gary relocated the buffer mound to within approximately fifteen feet of Koher Road.

On March 11, 2010, Plaintiffs filed a Verified Petition for Writ of Certiorari, seeking judicial review of the BZA's decision. The trial court issued its Writ of Certiorari in May 2010. Gary died on June 20, 2010, and his estate was substituted as a party in March 2011. The trial court held a hearing in the judicial review action in July 2011, after which it remanded for the limited purpose of the BZA providing revised findings of fact. The BZA issued revised findings in December 2011 and specifically noted among its findings that the removal of several mobile homes along with a new location for the buffer mound would constitute a significant improvement to the neighborhood and be of benefit to Gary's adjoining neighbors. Thereafter, the trial court ratified and confirmed the BZA's findings and conclusions. Plaintiffs appealed, and this court affirmed, concluding in a memorandum decision that the BZA did not err in granting Gary's request for an exception to modify and change his existing nonconforming use. *Stuckman v. Kosciusko Cnty. Bd. of Zoning Appeals*, Cause No. 43A03-1202-MI-69 (Ind. Ct. App. September 25, 2012) (the BZA Appeal).[6] Our Supreme Court denied transfer on January 31, 2013.

While the judicial review action was pending, Plaintiffs filed the instant Complaint for Injunctive Relief and Damages against Angela and the Estate on February 23, 2011. Plaintiffs sought to compel compliance with certain restrictive covenants contained in the Agreement. Specifically, Plaintiffs wanted the mound returned to its original location and landscaping thereon properly maintained, the sign removed, and a farm fence installed and maintained in the location set out in the Agreement. The BZA and the PPA were eventually

---

[6] In setting out the facts in this appeal, we have relied on many of the detailed background facts set out in the BZA Appeal, which are not in dispute.

added as defendants through a joinder of indispensable parties. The BZA filed its answer in June 2011, which included a number of affirmative defenses. Thereafter, the PPA filed its Disclaimer and Motion to Dismiss, stating that it "has no objection to the actions taken by other Defendants in regard to modification of the auto salvage business and in fact, as indicated by the minutes of the Board of Directors [from the October 2010 meeting], the [PPA] is pleased with the modifications." *Id*. at 57. Although the PPA acknowledged that it had given rights to Plaintiffs to initiate an individual action to enforce the Agreement, the PPA indicated it had no interest in the pending litigation and wished to be dismissed or made a nominal defendant with no further involvement.

This case remained dormant for almost two years until the conclusion of the BZA Appeal. In November 2013, Defendants and Plaintiffs each filed motions for summary judgment. Following a hearing, the trial court granted summary judgment on February 21, 2014 against Plaintiffs on their complaint.[7] Upon Plaintiffs' motion, the trial court entered an amended summary judgment order a week later, clarifying its original order. Plaintiffs now appeal, claiming that summary judgment was improperly granted in favor of Defendants and that it should have been granted in Plaintiffs' favor instead.

When reviewing a grant or denial of summary judgment, our well-settled standard of review is the same as it is for the trial court: we examine whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *City of N. Vernon v. Jennings Nw. Reg'l Util.,* 829 N.E.2d 1 (Ind. 2005). "Summary

---

[7] The court also granted summary judgment in favor of Plaintiffs as to a counterclaim filed by Angela. The court found that the claim was barred by laches. Angela does not challenge this ruling on appeal.

9

judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law." *Id*. at 3. We construe all evidence in favor of the opposing party, and we resolve all doubts as to the existence of a material issue against the moving party. *City of N. Vernon v. Jennings Nw. Reg'l Util.,* 829 N.E.2d 1. Further, the party appealing from the grant of summary judgment bears the burden of persuading this court that the decision was erroneous. *Ind. Dep't of Envtl. Mgmt. v. Lake Cnty. Solid Waste Mgmt. Dist*., 847 N.E.2d 974 (Ind. Ct. App. 2006), *trans. denied*. We will affirm a summary judgment order if it is sustainable on any legal theory or basis in the record. *Id*.

The trial court granted summary judgment in favor of Defendants based in large part on the doctrine of res judicata. The court found that Plaintiffs' claims regarding relocation of the mound were or could have been litigated in the proceedings related to the BZA Appeal. Further, the court concluded that the sign did not violate the Agreement.

Plaintiffs argue on appeal, as they did below, that res judicata is not applicable for a number of reasons, some of which follow. First, the Agreement was not addressed during the BZA hearing (though it was raised in the subsequent judicial review action). Second, even if the BZA had considered the Agreement in making its decision to grant the exception, the BZA's decision could not act to alter any private contractual rights and restrictive covenants contained in the Agreement. *See Highland Springs S. Homeowners Assoc., Inc. v. Reinstatler*, 907 N.E.2d 1067, 1073 (Ind. Ct. App. 2009) ("zoning ordinances and laws cannot relieve real estate from valid private restrictive covenants" and "the *implementation* of a variance cannot be in violation of valid and reasonable restrictive

covenants") (emphasis in original), *trans. denied*. Third, only the location of the buffer mound was litigated in the BZA action, not the other alleged violations of the Agreement raised in this action. Although at first blush we find many of these arguments appealing, it is unnecessary for us to decide whether Plaintiffs' claims are barred by res judicata. This is because even assuming the trial courted erred by applying the doctrine of res judicata, summary judgment was still properly granted in favor of Defendants for the reasons set forth below.[8]

Although there are tangential issues regarding the fence, trees, and signs, the main thrust of Plaintiffs' complaint for injunctive relief is that the relocation of the buffer mound closer to Koher Road violated the restrictive covenants set out in the Agreement. Plaintiffs assert that the restrictive covenants created a specific footprint within which the salvage operations were limited and that the mound was required to be 180 feet from the road.

Initially, we observe the well-established tenet that restrictive covenants are disfavored in Indiana law and will be strictly construed, with all doubts resolved in favor of the free use of property and against restrictions. *Johnson v. Dawson*, 856 N.E.2d 769 (Ind. Ct. App. 2006). "When restrictive covenant language is ambiguous, the paramount interpretation rule is to give effect to the actual intent of the parties at the time the covenant

---

[8] Plaintiffs claim that the trial court erred in denying their motion to strike certain uncertified designated evidence submitted by Defendants. This evidence includes minutes from the February 2010 BZA hearing, a document purporting to be the trial court's final order in the BZA Appeal, and excerpts from Plaintiffs' appellate briefs in the BZA Appeal. The two latter items relate to Defendants' res judicata arguments. Because we have determined to reach the merits, we conclude that inclusion of this evidence, even if in error, was harmless. Admission of the former was also harmless because Plaintiffs designated the full transcript from that same BZA hearing. Finally, we observe that both Plaintiffs and Defendants were haphazard in their designation of evidence below.

was made, as collected from the whole instrument construed in connection with the circumstances surrounding its execution." *Drenter v. Duitz*, 883 N.E.2d 1194, 1200 (Ind. Ct. App. 2008). Ultimately, our task is to apply the most reasonable interpretation of the restrictive covenant without broadening its intended scope. *See Drenter v. Duitz*, 883 N.E.2d 1194.

The parties agree that the restrictive covenants and the Agreement in which they are contained are not one and the same. Only Paragraph 7 of the Agreement sets out the restrictive covenants that run with the land and are enforceable by the individual lot owners upon approval of the PPA.[9] Plaintiffs, however, argue that because Paragraph 7 also addresses the buffer mound, Paragraph 4 is somehow subsumed into the restrictive covenants. While we agree that ambiguity exists within the Agreement, the interpretation advocated by Plaintiffs ignores the strict construction applicable to restrictive covenants.

Paragraph 7 sets out the following restrictive covenants:

> a.      All activity on Lots A through G, associated with the operation of a salvage yard, shall be conducted East and North of the proposed mound.
> b.      The owner of the property shall cause to be maintained the evergreen plantings on the mound located on the property.
> c.      Vehicles or salvage material located at the salvage yard operation shall be stacked so as not to be visible from Koher Road where it fronts on Lots A through G.
> d.      The salvage yard operated on the real estate shall operate only between the hours of 8:30 A.M. and 6:30 P.M. on Monday through Sunday, however, no heavy equipment operation shall occur on Sundays.
> e.      No signs shall be permitted on the site indicating the existence of the salvage yard or advertising items for sale, outside the mounded

---

[9]  Plaintiffs acknowledge that they have no right to enforce any provisions of the Agreement that fall outside of the restrictive covenants.

area, except such signs necessary to meet State requirements pertaining to a wrecker service.

f.     The owner of the premises shall maintain farm fencing on the West side of Lots A through G and the South side of Lot G, which fence shall be maintained in good order. The location of the fence shall be on the perimeter of the salvage yard operation as opposed to the boundary lines of the lots proper, but shall be no closer than one hundred fifty (150) feet to the East edge of the roadway of Koher Road.

g.     The salvage operation…shall be operated in compliance with Federal, State and local rules and regulations.

*Appellants' Appendix* at 33-34. In addition to safety and hours of operation, the clear intent behind the covenants is to improve the aesthetics of the area and ensure that the salvage operation will not be seen by residents and passersby from the west side of the mound. The precise placement of the mound is not set out in Paragraph 7 and, in fact, is not particularly relevant to the intended goal of creating a visual barrier between the salvage yard and the residential properties.

Further, at the time the PPA and Gary, Bertha, and Ned Stuckman entered into the Agreement, the record establishes that the Stuckmans maintained residences and rental properties along the western 150 feet of their lots. Accordingly, the parties to the Agreement naturally chose a location for the mound east of these residences. By 2010, approximately 22 years after execution of the Agreement, Gary sought approval from the BZA to remove all of the trailer homes along this 150-foot stretch and move the buffer mound closer to Koher Road. This modification, which was approved by the BZA and supported by the PPA, undoubtedly improved the aesthetics of the area and was not inconsistent with the intent of the Agreement. In other words, even with the new location

of the buffer mound, the salvage operations remained out of sight and north and east of the mound, as required by the restrictive covenants.

Plaintiffs do not hide the fact that they are concerned about the expansion of the salvage operations for other than aesthetic reasons. Plaintiffs claim that by expanding the footprint of the salvage yard "Angela is unfairly competing" and obtaining an "unfair advantage". *Appellants' Brief* at 25. As set forth above, the restrictive covenants were entered into to shield residential lot owners from visual and other annoyances associated with the operation of a salvage yard. The intent was not to protect adjacent business owners from competition with respect to a similar nonconforming use of their lots.[10]

We reject Plaintiffs' invitation to read into Paragraph 7 that which it does not expressly provide. Had the parties to the Agreement intended for the precise location of the buffer mound to be a covenant running with the land, that provision would have been included in Paragraph 7. Accordingly, the subsequent relocation of the buffer mound did not constitute a violation of the restrictive covenants set out in the Agreement.

We now turn to the remaining issues regarding the sign, trees, and fence.[11] With respect to the sign, the trial court correctly determined that it does not violate the restrictive covenants. The sign simply says "STUCKMAN'S", with no indication to passersby that a salvage yard exists on the other side of the mound. Of course, the sign is intended to alert

---

[10] Daniel Sr.'s lots, in fact, were owned by Ned and Bertha Stuckman (along with Lots A though G) at the time the Agreement was entered into.
[11] Plaintiffs address these issues in passing in less than two pages of their forty-page appellate brief. Accordingly, our treatment of these remaining issues will be brief.

those looking for the salvage yard, but the sign does not directly communicate the existence of a salvage yard to the general public.

The restrictive covenants require farm fencing to be maintained "in good order" along the western and southern perimeter of the salvage yard. *Appellants' Appendix* at 34. The covenants also indicate that the fencing shall be "no closer than one hundred fifty (150) feet to the East edge" of Koher Road. *Id*. The record indicates that such fencing was installed as required by the Agreement. Some twenty five years later, however, the fence exists in "just pieces…here and there scattered." *Id*. at 299.

We initially observe that the location of the fence relative to Koher Road was based upon the original residential uses of the 150-foot strip along the road. Those residential trailers no longer exist along this stretch, thus defeating the purpose behind the limitation on placement of the fence set out in the restrictive covenants. Moreover, regardless of the location of the farm fencing, it is apparent that the fence has not been maintained for a significant period of time, likely since it was first installed. Plaintiffs cannot be heard now to complain about the fence or lack thereof, as this complaint is surely barred on grounds of laches and/or statute of limitations.

Finally, we turn to the trees on the buffer mound. Plaintiffs claim that Gary and now Angela have failed to properly maintain the buffer mound and that it is "overgrown with weeds." *Appellants' Brief* at 23; *Appellants' Appendix* at 20 (the complaint). Based upon our reading of Paragraph 7, there is no requirement that the mound be *well*

maintained.[12]  Rather, the only requirement is that pine trees remain on the buffer mound. The new plans submitted by Gary and approved by the BZA in 2010 call for a pine tree buffer along the relocated mound.  This is in compliance with the restrictive covenants.

We affirm the trial court's grant of Defendants' motion for summary judgment and denial of Plaintiffs' competing motion for summary judgment with respect to Plaintiffs' complaint.

Judgment affirmed.

VAIDIK, C.J., and MAY, J. concur.

---

[12]  The fence provision, on the other hand, expressly requires that the fence be maintained "in good order". *Appellants' Appendix* at 34

16