**Chris DRENTER and Diann Drenter, Appellants–Defendants,**

v.

**Sue N. DUITZ, et al., Appellees– Plaintiffs.**

No. 22A05–0706–CV–349.

Court of Appeals of Indiana.

April 10, 2008.

Rehearing Denied June 12, 2008.

Michael G. Naville, Steven A. Gustafson, New Albany, IN, Attorneys for Appellants.

John A. Kraft, New Albany, IN, Attorney for Appellees.

## OPINION

BAKER, Chief Judge.

All parties in this action own property in Floyd County's Bent Creek Subdivision (the Subdivision). The appellants and the appellees disagree about whether the Subdivision's restrictive covenants permit a property owner to erect a shed on his property and, if so, the process for obtaining approval.

Appellants-defendants Chris and Diann Drenter (collectively, the Drenters) appeal the trial court's judgment in favor of appellees-plaintiffs Sue N. Duitz, Ann Carr, Curtis Durbin, Sandra L. Durbin, Shirley M. Ohta, Michael Sallee, Diane Sallee, Edward Woods, and Sherry Woods (collectively, the appellees). Specifically, the Drenters argue that the trial court erroneously construed the Subdivision's restrictive covenants to require a property owner to engage in a multi-step approval process before erecting a shed on his property. We agree with the Drenters that the trial court improperly relied on extrinsic evidence to support its finding that the restrictive covenants require a property owner to obtain the signatures of all of the Subdivision's property owners before erecting an outbuilding. However, we conclude that the trial court properly construed the restrictive covenants to require a property owner to obtain the written approval of the Subdivision's Developer or its assignee before erecting an outbuilding. Because the Drenters did not obtain the written approval of the Subdivision's Developer and there is no evidence that there is an assignee, we affirm in part, reverse in part, and remand with instructions contained herein.

### FACTS

The Drenters own two parcels of land in the Subdivision. In June 2004, the Drenters erected a storage shed on one of the

parcels without obtaining the approval of the Subdivision's Developer, other property owners, or the homeowners association (HOA).

The Subdivision's restrictive covenants were executed and recorded on January 7, 1992. All real estate located in the Subdivision is subject to the restrictive covenants, the relevant sections of which provide:

1. *Primary Use Restrictions* No lot shall be used except for private single-family residential purposes. No structure shall be erected, placed or altered or permitted to remain on any lot except on[e [1]] single family dwelling designed for the occupancy of one family (including any domestic servants living on the premises), not to exceed two and one-half (2 1/2) stories in height and containing a private garage for the sole use of the owner and occupants of the lot. . . .

2. *Approval of Construction and Landscape Plans* No structure may be erected, placed or altered on any lot until plans are submitted showing the (a) location of improvements on the lot; (b) the grade elevation (including rear, front, and side elevations); (c) the type of exterior material, and (d) the location and size of driveway (which shall be asphalt or concrete and laid or poured within six months of completion of construction) shall be approved, in writing, by the Developers or any person, firm, corporation, or association to whom it may assign such right.

In addition to the plans referred to in the previous paragraph, a landscape plan shall be submitted to the Developer for its approval in writing, which plan shall show trees, shrubs, and other plantings.

References to "Developer" in this paragraph shall include any person, firm, corporation or association to whom Developer may assign the right of approval. References to "structure" in this paragraph shall include any building (including a garage), fence, or wall.

\* \* \*

9. *Use of Other Structures and Vehicles*

a) No other structure [of] a temporary character shall be permitted on any lot except temporary tool sheds, or field offices used by a builder or Developers, which shall be removed when construction or development is completed.

b) No outbuilding, trailer, basement, tent, shack, garage, barn, or structure other than the main residence erected on a lot shall at any time be used as a residence, temporarily or permanently.

\* \* \*

19. *Restrictions Run With Land* Unless altered or amended under the provisions of this paragraph, these Covenants and Restrictions are to run with the land and shall be binding on all parties claiming under them for a period of twenty-five (25) years from the date this document is recorded, after which time they shall be renewed by Homeowners Organization by majority vote to alter and/or continue.

Failure of any owner to demand or insist upon observance of any of these restrictions, or to proceed for restraint of violation of any of these restrictions, or to proceed for restraint of violation shall not be deemed a waiver of the

---

**1.** Paragraph 1 actually contains the word "on" instead of the word "one." This appears to be a scrivener's error. Appellees' Br. p. 11.

violation, or the right to seek enforcement of these restrictions.

20. *Enforcement* Enforcement of these restrictions ... shall be by proceeding at law or in equity, brought by any owner of real property in Bent Creek Subdivision or by the Developer against any party violating or attempting to violate any covenant or restriction ...

Appellees' App. p. 48–59.

The Drenters filed a request that the HOA approve their shed at a meeting on August 21, 2005—more than a year after the shed was built. The appellees filed a complaint against the Drenters on September 9, 2005, alleging that the Drenters' shed violated the Subdivision's restrictive covenants and requesting that the trial court order the shed to be removed. The Drenters withdrew their request for the HOA's approval on October 23, 2005.

A two-day bench trial began on October 9, 2006. On May 23, 2007, the trial court issued its judgment in favor of the appellees, finding, in relevant part:

### FINDINGS OF FACT

\* \* \*

12. Subsequent to the original [restrictive covenant] recording, on October 12, 1993 three (3) separate Waivers were recorded in the office of the Recorder....

13. The three (3) combined documents had one hundred percent (100%) of all lot owners' signatures....

\* \* \*

18. The [HOA] appears to have functioned on a formal basis (regular meetings, officers, directors being elected) and on an informal basis (committee) at varying times since [the Subdivision] was platted and approved[ ]. No duly promulgated and authenticated by-laws were offered into evidence. It is unclear as of the trial of this cause if there is a legally functioning [HOA].

\* \* \*

21. Sheds have been an issue in [the Subdivision] since 1996 up to the time of the trial of this cause. There have been many opinions but no unanimity among the homeowners on such issue. Defendant testified that there exists a passionate difference of opinion as to sheds. The totality of the evidence confirms this.

\* \* \*

### CONCLUSIONS OF LAW

8. Considering the language of the second paragraph of [restrictive covenant] Number 19, the fact that some of the [appellees] and other lot owners may be in violation of the [restrictive covenants] or that the [appellees] may have acquiesced in prior violated or perceived violations of the [restrictive covenants] does not bar [the appellees] from challenging [the Drenters'] erection of the shed. In other words, there has been no waiver of the right of enforcement of the [restrictive covenants]. Non-waiver clauses are generally enforced in Indiana. *Johnson v. Dawson,* 856 N.E.2d 769 (Ind.Ct.App.2006). Paragraph 19 contains an unambiguous non-waiver clause and its enforcement is not adverse to public policy. As such, [the Drenters] are barred from raising the defense of acquiescence.

9. Considering the language of the first paragraph of [restrictive covenant] Number 19[,] the most reasonable interpretation of such paragraph is that the [restrictive covenants] run with the land and are binding on all lot owners for a period of twenty-five (25 years) which

period ends on January 7, 2017. At that time, the [HOA] may, by majority vote, alter, amend or continue the [restrictive covenants]. *Prior to January 7, 2017, any modification to the [restrictive covenants] pertaining to [the Subdivision] is subject to one hundred percent (100%) of the lot owners agreeing to the same and memorialized such modification in writing and in recordable form.*

10. On their respective faces, [restrictive covenants] Number 1 and Number 9(b) would appear to be ambiguous. The ambiguity is that Number 1 appears to limit a lot to one (1) structure to be used for a single family dwelling while Number 9(b) appears to contemplate that other structures could be erected on a lot provided that the same not be used as a residence, either temporarily or permanently. Indeed, the heading Number 9 specifically says *Use of Other Structures.* The ambiguity is also evidenced by the language of [restrictive covenant] Number 8(b) which allows for garages as separate structures while Number 1 appears to say that the single family residential structure must *contain* a private garage.

11. Considering the ambiguous and unambiguous language together and in conjunction with [restrictive covenants] 2 and 3(a)[,] a reasonable and sensible harmonizing and interpretation of [restrictive covenants] 1 and 9(b) as to structures is as follows:

A. Other structures, i.e. buildings, besides a single family dwelling, may be erected on lots within [the Subdivision] provided such structures may not be used at any time as a residence, temporarily or permanently.

B. A shed such as the one erected by [the Drenters] is an outbuilding and therefore a permissible structure.

C. Prior to erection or placement of a second structure on a lot, plans showing (a) the location of the proposed structure on the lot, (b) the grade elevation, and (c) the type of exterior material to be used must be approved in writing by the Developers or their assignee (which could be the [HOA]) pursuant to [restrictive covenant] Number 2.

D. After approval is obtained as provided for in C., then One Hundred Percent (100%) of the lot owners of [the Subdivision] must agree in writing to the same and a modification of the [restrictive covenants] must be memorialized in writing and in recordable form.

12. Prior to erecting the shed on their lot, the [Drenters] did not obtain prior approval of the plans for such shed from the Developers of [the Subdivision].

13. Prior to erecting the shed on their lot, the [Drenters] did not obtain the approval to do so by one hundred percent (100%) of the lot owners of [the Subdivision].

14. The [Drenters] have violated the [Subdivision's restricted covenants] by erecting a shed (outbuilding) on their lot without the requisite approval.

15. [The appellees] are entitled to enforcement of the [restrictive covenants] and enforcement thereof does not violate public policy.

\* \* \*

### JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED [that the appellees] be granted a judgment against [the Drenters] and the shed (outbuilding) on [the Drenters'] lot (Lot 2) shall be removed therefrom not later than September 30, 2007.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED the [Subdivision's restrictive covenants] are not ambiguous and are subject to modification only upon one hundred percent (100%) of the owners agreeing to the same and memorializing such agreement (modification) in writing and in recordable form. The [Drenters] are further enjoined from the construction of any additional structures on their real estate unless and until they have written approval of one hundred percent (100%) of the lot owners or have otherwise complied with this Judgment.

Appellants' App. p. 32–41 (some emphases in original and some added). The Drenters now appeal.

## DISCUSSION AND DECISION

The Drenters argue that the trial court erred in interpreting the restrictive covenants at issue "to require a multi[-]step procedure for obtaining permission to erect a garden shed." Appellants' Br. p. 6. Specifically, the Drenters argue that (1) the ambiguous provisions should have been construed in favor of the free use of land, (2) the Developer approval requirement in Paragraph 2 was not intended to apply after the Subdivision's development was finished, (3) the trial court's conclusion that 100% of the Subdivision's property owners must approve an outbuilding is not supported by the text of the restrictive covenants, (4) the trial court's multi-step approval process is impossible to comply with, and (5) the appellees waived any alleged violation by not enforcing the restrictive covenants against a landowner who erected a shed on his property before the Drenters.

### I. General Law

The law pertaining to restrictive covenants is well settled:

A restrictive covenant is an agreement between a grantor and a grantee in which the latter agrees to refrain from using his property in a particular manner. One purpose of restrictive covenants is to maintain or enhance the value of land by controlling the nature and use of lands subject to a covenant's provisions. Because covenants are a form of express contract, we apply the same rules of construction. Construction of the terms of a written contract is a pure question of law for the court and we conduct a de novo review of the trial court's conclusions in that regard.

Indiana law permits restrictive covenants but finds them disfavored and justified only to the extent they are unambiguous and enforcement is not adverse to public policy. When courts are called upon to interpret restrictive covenants, they are to be strictly construed, and all doubts should be resolved in favor of the free use of property and against restrictions. The covenanting parties' intent must be determined from the specific language used and from the situation of the parties when the covenant was made. Specific words and phrases cannot be read exclusive of other contractual provisions. In addition, the parties' intentions must be determined from the contract read in its entirety. We attempt to construe contractual provisions so as to harmonize the agreement and so as not to render any terms ineffective or meaningless.

*Johnson v. Dawson*, 856 N.E.2d 769, 772–73 (Ind.Ct.App.2006) (citations omitted).

### II. Permissibility of Outbuildings

■ Paragraph 1 of the restrictive covenants provides that "[n]o structure shall be erected, placed or altered or permitted to remain on any lot except on[e] single family dwelling designed for the occupancy of one family." Appellees' App. p.

48. Paragraph 9—titled "Use of *Other Structures* and Vehicles"—provides that "[n]o outbuilding, trailer, basement, tent, shack, garage, barn, or structure [collectively, outbuilding] other than the main residence erected on a lot shall at any time be used as a residence, temporarily or permanently." *Id.* at 51 (emphasis added).

The parties agree that these paragraphs are inconsistent, inasmuch as Paragraph 1 provides that only one "structure"—a single-family dwelling—shall be erected on a lot, while Paragraph 9 contemplates the use of outbuildings on the lot as long as they are not used as a temporary or permanent residence. However, the parties disagree about how to reconcile these inconsistent provisions. The Drenters argue that "rather than finding against the restrictions based on this ambiguity, the [trial] court chose instead to speculatively expand the covenants and read them to require a multi-step procedure for obtaining permission to construct any outbuilding." Appellants' Br. p. 9. The appellees argue that Indiana caselaw supports the trial court's interpretation.

 When restrictive covenant language is ambiguous, the paramount interpretation rule is to give effect to the actual intent of the parties at the time the covenant was made, as collected from the whole instrument construed in connection with the circumstances surrounding its execution. *Renfro v. McGuyer,* 799 N.E.2d 544, 547 (Ind.Ct.App.2003). Words, phrases, sentences, paragraphs, and sections of a restrictive covenant should not be read in isolation. *Id.* We consider ambiguous and unambiguous language together and apply the most reasonable interpretation. *Johnson,* 856 N.E.2d at 774.

Analyzing the ambiguous and unambiguous language of the Subdivision's restrictive covenant together, it is apparent that the drafters planned to allow a property owner to erect only one single-family dwelling per lot but that the owner could erect "other structures" on the lot as long as those outbuildings were not used as a residence, temporarily or permanently. This interpretation is reinforced by Paragraph 8(b), which provides that "[g]arages, *as separate structures,* are subject to prior plan approval under [Paragraph] 2 hereof." Appellees' App. p. 51 (emphasis added). Paragraph 8(b) makes it clear that outbuildings are permissible if they are approved pursuant to Paragraph 2, which we will discuss momentarily. Therefore, we conclude that, pursuant to the Subdivision's restrictive covenants, it is permissible for a property owner to erect an outbuilding—e.g., a shed—on his property.

### III. Two–Step Approval Procedure

We now turn to the trial court's conclusion that the restrictive covenants require a property owner, before erecting an outbuilding, to obtain the written approval of (1) the Subdivision's Developer or its assignee and (2) 100% of the Subdivision's property owners.

#### A. Developer Approval

 As support for its conclusion that a property owner must seek approval from the Developer, the trial court cites Paragraph 2 of the restrictive covenants, which, in part, provides that "[n]o structure may be erected, placed or altered on any lot until plans are submitted ... [and] approved, in writing, by the Developers or any person, firm, corporation, or association to whom it may assign such right." Appellees' App. p. 48.

The Drenters argue that Paragraph 2's requirement that the Developer approve structural plans "was not intended to continue to apply after [the Subdivision's] development was finished." Appellants' Br. p. 9. However, the Drenters do not direct us to any evidence in the record that the

approval requirement was only intended to apply until the initial development of the Subdivision was finished. And it seems unlikely that Paragraph 2 would explicitly allow for assignee approval if it was only intended to apply during the initial development of the Subdivision. Thus, we reject the Drenters' argument.

■ Alternatively, the Drenters argues that Paragraph 2's approval requirement is "legally impossible to fulfill" because "[n]o evidence on the record indicates that now, fourteen years after the development, the [D]evelopers continue to approve or deny requests" and there is no evidence that there is an assignee. Appellants' Br. p. 13, 14. Legal impossibility is an affirmative defense that the invoking party has the burden to establish. *North v. Newlin,* 416 N.E.2d 144, 150 (Ind.Ct. App.1981). Because the Drenters presented no evidence that the Developer no longer approves or denies building requests pursuant to Paragraph 2, we reject their argument. Thus, we affirm the trial court's conclusion that, pursuant to Paragraph 2, a property owner must seek written approval from the Developer or its assignee before erecting an outbuilding on his property.

## B. 100% Approval of Subdivision Property Owners

■ The trial court did not cite language from the restrictive covenants to support its conclusion that 100% of the Subdivision's property owners must approve an outbuilding before it is erected. However, the parties agree that the trial court likely relied on extrinsic evidence presented at trial that previous property owners had obtained the written approval of 100% of the other property owners before modifying their property in a manner violating the restrictive covenants. Specifically, evidence was presented that three

restrictive covenant waivers had been recorded with the Floyd County Recorder's Office and each of those contained the signatures of 100% of the Subdivision's property owners.

The Drenters remind us that the law generally disfavors restrictive covenants, we strictly construe them, and all doubts should be resolved against the restrictions and in favor of the free use of property. *Johnson,* 856 N.E.2d at 773. The Drenters argue that there is no language in the covenants to support the 100% written approval requirement; thus, the trial court should not have imposed an additional hurdle contravening the free use of land.

The appellees concede that "the Restrictions provide no mechanism for waiver or modification of the Restrictions during the first twenty-five (25) years." Appellees' Br. p. 15. However, the appellees direct us to *Wischmeyer v. Finch* and argue that Indiana caselaw requires all property owners to approve restrictive covenant waiver or modification. *See* 231 Ind. 282, 107 N.E.2d 661 (1952) (interpreting statute in effect at that time to require all owners of a recorded plat of land to provide written approval for the plat to be modified).

We first note that appellees do not direct us to a statute currently in effect that is analogous to the statute the *Wischmeyer* court interpreted to reach its holding. Nonetheless, we conclude that the *Wischmeyer* decision is inapplicable to the facts of this case because, unlike in *Wischmeyer,* the Drenters do not want to modify or amend the Subdivision's restrictive covenants. Instead, the Drenters merely want to maintain an outbuilding on their property and, as we have already held, Paragraph 2 provides a mechanism for them to seek approval before erecting an outbuilding. In other words, the *Wischmeyer* decision is inapplicable because modifying the restrictive covenants is not

at issue—instead, the Subdivision's restrictive covenants explicitly provide a procedure for a property owner to seek approval of a proposed outbuilding,

Alternatively, the appellees argue that the trial court properly relied on extrinsic evidence showing that previous Subdivision property owners who wanted to violate the restrictive covenants received written approval from all of the other property owners. While this may be true, it does not affect our conclusion that there is nothing in the restrictive covenants requiring the Drenters to seek such approval before erecting an outbuilding. Instead, as previously noted, the Subdivision's restrictive covenants only require a property owner to seek approval from the Developer or its assignee before erecting an outbuilding. Thus, we reject the appellees' plea to focus on extrinsic evidence to uphold the trial court's ruling.

In sum, we reject the trial court's conclusion that a property owner must obtain the written approval of 100% of the Subdivision's property owners before erecting an outbuilding. The language of the restrictive covenants does not support that requirement, which certainly fails to favor the free use of property. In other words, because the language of the restrictive covenants does not support the trial court's 100% written approval requirement, the trial court erred by interpreting the covenants to require that onerous hurdle. Because the trial court's interpretation violates our penchant for strictly construing restrictive covenants in favor of the free use of property, it cannot stand.

## IV. Non–Waiver Provision

■ The Drenters argue that the appellees have waived their right to enforce the restrictive covenants. Specifically, the Drenters contend that "another landowner in the [Subdivision] built a garden shed[ ] without controversy[;] therefore, the appel-

lees cannot selectively enforce the covenants just to 'raise[ ] neighborhood drama and politics to a new litigious level.'" Appellants' Br. p. 15–16. In other words, the Drenters argue that the appellees acquiesced to the Drenters' violation by not enforcing the outbuilding-approval requirement against another property owner who built a shed on his property.

Paragraph 20 provides that "[e]nforcement of these restrictions ... shall be by proceeding at law or in equity, brought by any owner of real property in [the Subdivision] or by the Developer against any party violating or attempting to violate any covenant or restriction." Appellees' App. p. 57. Paragraph 19 provides:

19. *Restrictions Run with Land*

Unless altered or amended under the provision of this Paragraph, these covenants and restrictions are to run with the land and shall be binding on all parties claiming under them for [a] period of Twenty-five (25) years from the date this document is recorded, after which time they shall be renewed by Homeowners Organization by majority vote to alter and/or continue.

Failure of any owner to demand or insist upon observance of any of these restrictions, or to proceed for restraint of violation of any of these restrictions, or to proceed for restraint of violation *shall not be deemed a waiver of the violation, or the right to seek enforcement of these restrictions.*

*Id.* at 56–57 (emphasis added).

Paragraph 19 contains a non-waiver clause that protects the appellees from waiving their right to enforce the restrictive covenants after acquiescing to previous violations. In *Johnson*, we upheld a similar non-waiver clause after emphasizing that

[u]nambigous provisions in restrictive covenants will generally be enforced according to their terms. These Restrictions were drafted to allow enforcement of restrictive covenants by individual homeowners. The non-waiver provision, by its plain language, is intended to prevent a waiver based on prior inaction in enforcing the Restrictions. To hold otherwise would render the non-waiver provision meaningless and violate the expressed intention of the contract among the property owners. . . .

Further, enforcement of the nonwaiver clause in the multiparty context allows prospective purchasers of property to rely on recorded restrictions and covenants. . . . Paragraph number twenty-seven of the [Subdivision's] restrictive covenants is an unambiguous nonwaiver clause, and its enforcement is not adverse to public policy.

856 N.E.2d at 775.

Based on the rationale of *Johnson,* we hold that the non-waiver provision of the Subdivision's restrictive covenants is enforceable because it is unambiguous and its enforcement is not adverse to public policy. Thus, the appellees did not waive their right to enforce the Subdivision's restrictive covenants and the Drenters' argument fails.

## V. Remedy

What happens to the shed the Drenters erected on their property? We have already concluded that the Drenters were entitled to erect the shed as long as the Developer or its assignee provided written approval of the plans that the Drenters were required to submit pursuant to Paragraph 2. However, as the Drenters acknowledge, they did not seek the Developer's approval before erecting the shed and there is no evidence that the Developer has assigned its rights to the HOA or any other entity.[2] Appellants' Br. p. 13. Because there is no evidence that the Drenters complied with Paragraph 2, we must conclude that they erected their shed in violation of the Subdivision's restrictive covenants.

The judgment of the trial court is affirmed in part, reversed in part, and remanded to the trial court with instructions that it impose a deadline for the Drenters to obtain approval for the shed pursuant to Paragraph 2 and order the shed to be removed if the Drenters do not comply with the deadline.

DARDEN, J., and BRADFORD, J., concur.

---

2. In fact, the trial court acknowledged that "[i]t is unclear as of the trial of this cause if there is a legally functioning [HOA.]" Appellants' App. p. 34 (emphasis added). Nonetheless, it is not disputed that the Drenters did not obtain the HOA's approval to erect the shed.