Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEYS FOR APPELLANTS:

**J. MICHAEL KATZ**
**LISA M. ROSS**
Goodman Katz & Scheele
Highland, Indiana

**ADAM J. SEDIA**
Rubino Ruman Crosmer & Polen
Dyer, Indiana

ATTORNEYS FOR APPELLEES:

**KEVIN E. WERNER**
Merrillville, Indiana

**SCOTT PYLE**
Calumet City, Illinois

FILED
Nov 20 2013, 10:06 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| JOHN S. PANIAGUAS, KATHY R. PANIAGUAS, WOODROW CORNETT, III, and KRISTINE E. CORNETT, | ) ) ) ) |
| Appellants-Plaintiffs, | ) ) |
| vs. | ) No. 45A03-1205-PL-244 ) |
| ENDOR, INC. *et al.*,[1] | ) ) |
| Appellees-Defendants. | ) |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable John R. Pera, Judge
Cause No. 45D10-0310-PL-122

**November 20, 2013**
**MEMORANDUM DECISION - NOT FOR PUBLICATION**
**KIRSCH, Judge**

---

[1] We note that the trial court entered a default judgment against Endor, Inc. on all issues of causation and liability due to failure to cooperate and provide discovery. However, "[u]nder Indiana Appellate Rule 17(A), '[a] party of record in the trial court or Administrative Agency shall be a party on appeal.'" *Hoosier Outdoor Adver. Corp. v. RBL Mgmt., Inc.*, 844 N.E.2d 157, 162 (Ind. Ct. App. 2006) (quoting Ind. Appellate Rule 17(A)). This appeal only concerns the claims against the homeowners in both Units 1 and 2 who purchased homes from Endor Inc., but due to the lengthy number of appellees involved and to conserve space in the caption, we only list Endor, Inc. as it is the first party named in the caption.

This case arises from a dispute between two groups of homeowners of homes in the same subdivision in Crown Point, Indiana. John S. Paniaguas, Kathy R. Paniaguas, Woodrow Cornett, III, and Kristine E. Cornett (collectively, "the Paniaguas parties") own homes in Unit 1 of the subdivision that were built by the initial developer of the subdivision, Aldon Companies, Inc. ("Aldon"). The Appellee Homeowners subsequently purchased homes in the same subdivision, some of which were in Unit 1 and some of which were in Unit 2, that were built by a second developer, Endor, Inc. ("Endor"). The Paniaguas parties appeal the trial court's order that determined that the Appellee Homeowners' homes were in compliance with the Restrictive Covenants of the subdivision, raising the following consolidated and restated issues:

I. Whether the trial court erred in determining that the Paniaguas parties lacked standing to enforce the Restrictive Covenants against the homeowners in Unit 2 of the subdivision based on the trial court's finding that the Restrictive Covenants only applied to Unit 1 of the subdivision;

II. Whether the trial court abused its discretion in admitting the minutes of the Endor Architectural Control Committee under the business records exception to the hearsay rule; and

III. Whether the evidence presented failed to support the trial court's finding that all of the homes built by Endor complied with the Restrictive Covenants.

The Appellee Homeowners cross-appeal and raise the following restated issue:

IV. Whether the trial court erred in not granting them attorney fees because the Paniaguas parties' claims were frivolous.

We affirm.

2

**FACTS AND PROCEDURAL HISTORY**[2]

Fieldstone Crossing is a single-family residence subdivision located in Crown Point, Indiana. Aldon was the initial developer for Units 1 and 2 of the subdivision. Unit 1 of Fieldstone Crossing consists of nineteen single-family residences, and its plat was properly recorded with the Lake County Recorder on October 7, 1992. Unit 2 consists of eighteen single-family residences, and its plat was properly recorded with the Lake County Recorder on May 13, 1997. Aldon had initially created four "ABCD" home models, the Applewood, the Birchwood, the Cherrywood, and the Dogwood, each with four different elevations for Fieldstone Crossing. *Tr.* at 339.

Aldon, through its president, Alfred Gomez, Jr., and its secretary, Brad Gomez ("Gomez"), executed a document titled, "Declaration of Restrictive Subdivision Covenants of Fieldstone Crossing Subdivision, City of Crown Point, Lake County, Indiana" ("the Restrictive Covenants"). The Restrictive Covenants were subsequently recorded with the Lake County Recorder on March 30, 1993 and re-recorded on July 8, 1993 to reflect an amendment. At the time the Restrictive Covenants were recorded, Unit 2 had not been platted, and the language of the Restrictive Covenants stated that the "land affected by these restrictions and covenants, is annexed hereto and made a part hereof as Exhibit A," which is the legal description of Unit 1. *Pls.' Ex.* 8, *Ex. Vol.* 7 at 1053, 1057-

---

[2] Oral argument was heard on this case on August 28, 2013 in Indianapolis. We commend counsel on the quality of their written and oral advocacy.

3

58.[3] Nowhere in the language of the Restrictive Covenants did it state that they applied to both Units 1 and 2 of Fieldstone Crossing, and Gomez testified that he was under the belief that the Restrictive Covenants were only meant to apply to Unit 1. *Tr.* at 290.

One of the provisions contained in the Restrictive Covenants states in pertinent part:

> 2.      ARCHITECTURAL CONTROL
>
> No home or structure shall be erected, placed or altered on any lot until construction plans and specifications and the plans showing the location of the structure have been approved by the Architectural Control Committee as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topography and finish grade elevation. No fence or wall shall be erected, placed or altered on any lot unless similarly approved. All buildings such as recreational buildings, storage sheds, pools, decks, etc. must have written approval of [the] Committee.

*Pls.' Ex.* 8, *Ex. Vol.* 7 at 1051. The Restrictive Covenants further state that the Architectural Control Committee ("the ACC") "reserves the right to enforce compliance with these covenants." *Id.* at 1053. During the time that Aldon owned and developed Fieldstone Crossing, the ACC consisted of Alfred Gomez, Jr., Gomez, and Aldon, by Brad Gomez.

In mid-1993, John S. Paniaguas and Kathy R. Paniaguas (together "Paniaguas") contacted Aldon's sales representative regarding building a home in Fieldstone Crossing. After deciding to build their home in Fieldstone Crossing, they completed a contract for purchase of a lot in Unit 1 and for Aldon to construct a home on the lot, and Aldon

---

[3] We note that this case contains a voluminous record, consisting of eighteen volumes of exhibits, which are consecutively paginated. As such, we will refer to exhibits with their exhibit number and with their corresponding exhibit volume and page number.

conveyed the title to the lot to Paniaguas. During the planning stage of building their home, Paniaguas declined to have their home constructed strictly according to one of the ABCD model home designs that Aldon had created for the subdivision, and instead, requested a model that incorporated features used by another developer that were over and above the standard features offered by Aldon for Fieldstone Crossing. Paniaguas's requests, which were approved by Gomez, resulted in Paniaguas having a semi-custom built home that cost more than any of the other homes that would later be built in Units 1 or 2 of Fieldstone Crossing. Because Paniaguas's home was to be the first one constructed in Fieldstone Crossing, Paniaguas wanted to ensure that subsequently built homes would maintain the aesthetic standards and compliment the value of their home. Paniaguas believed that the Restrictive Covenants would ensure this since any new construction would have to be approved by the ACC.

On May 21, 2001, Woodrow Cornett, III and Kristine E. Cornett (together "the Cornetts") purchased a nearly completed Aldon home in Fieldstone Crossing. The design of the Cornetts' home did not come from the basic Aldon ABCD models, but instead, came from an Aldon portfolio of twenty-one different home designs. The Cornetts first viewed and purchased their home after it had been substantially completed by Aldon, and the Cornetts were limited to selecting options for carpeting, light fixtures, and door knobs.

Between 1993 and 2002, Aldon constructed, sold, and conveyed its interest in a total of nine homes in Fieldstone Crossing, including Paniaguas's and the Cornetts' homes. On December 11, 2002, Aldon entered into an agreement to sell its development

5

and ownership rights in the remaining twenty-eight, then undeveloped, properties spread between Units 1 and 2 of Fieldstone Crossing to Endor, Inc. ("Endor").  Pursuant to the agreement, Endor was to assume responsibility for enforcing the Restrictive Covenants and to assume control of the ACC.  In February 2003, Aldon conveyed its ownership and development rights to Endor by way of a trustee's deed.  Between 2003 and 2007, Endor constructed, sold, and conveyed its interest in a total of twenty-eight homes in Fieldstone Crossing.  All twenty-eight of these homes were built upon the lots Endor had acquired from Aldon.

After completion of the first Endor-built home, the Paniaguas parties and several other Aldon homeowners, filed a complaint on October 15, 2003 for preliminary injunction, permanent injunctive relief, and monetary damages against Endor, seeking to enjoin Endor from constructing additional homes in Fieldstone Crossing and for damages resulting from the construction of homes in violation of the Restrictive Covenants.  On November 14, 2003, and on January 21, 2004, the trial court held a hearing on the Paniaguas parties' request for a preliminary injunction and denied the request on June 16, 2004, finding that the Paniaguas parties failed to demonstrate that an inadequate remedy at law existed.  *Appellants' App*. at 411-20.  On July 14, 2004, the Paniaguas parties filed a "Notice of *Lis Pendens*" on all of the Endor-purchased properties to provide notice of the pending lawsuit regarding the applicability of the Restrictive Covenants.  *Id*. at 101, 421-35.  On October 15, 2004, the Paniaguas parties filed an amended complaint to add defendants, including Aldon, officers of both Endor and Aldon, and unknown homeowners who had, at that time, purchased Endor-constructed homes.  On January 21,

6

2005, Aldon and its officers, filed a motion to dismiss the claims against them, which the trial court granted. The Paniaguas parties appealed this order, and on May 18, 2006, this court affirmed the trial court in a published opinion, *Paniaguas v. Endor, Inc.*, 847 N.E.2d 967 (Ind. Ct. App. 2006), *trans. denied*.

Over the course of these proceedings, the Paniaguas parties amended their complaint eight times to add the names of parties they believed were necessary for the just adjudication of their claims, including successive homeowners who either purchased their home directly from Endor or from an Endor homeowner (collectively, "the Appellee Homeowners") and the members of the Endor ACC. On December 21, 2007, the Paniaguas parties served a request for the production of documents on counsel for Endor and the Endor ACC (together, "the Endor Defendants"), and on June 11, 2008, the Paniaguas parties filed a motion to compel discovery because the Endor Defendants failed to respond to the request for production of documents. After a hearing, the trial court issued an order compelling the Endor Defendants to respond to the request for production of documents. The Endor Defendants responded to the Paniaguas parties' request with objections to numerous requests as overbroad and unduly burdensome. The Paniaguas parties filed a second motion to compel discovery, and the trial court again issued an order compelling discovery from the Endor Defendants. On May 28, 2010, the Paniaguas parties moved for default judgment against the Endor Defendants, and on July 12, 2010, the trial court entered a judgment of default against the Endor Defendants on all issues of causation and liability as the sanction imposed for failure to cooperate with and provide discovery. On August 5, 2011, the Appellee Homeowners filed a motion

7

requesting written findings of fact and conclusions of law pursuant to Indiana Trial Rule 52, which was granted by the trial court. A five-day bench trial was held from August 8 through 12, 2011, and on May 10, 2012, the trial court issued its judgment in favor of the Appellee Homeowners. The Paniaguas parties now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

The Paniaguas parties are appealing from a negative judgment following a bench trial. Our standard of review in such cases is well settled. We will set aside the judgment only upon a showing that the judgment is clearly erroneous. *Ream v. Yankee Park Homeowner's Ass'n, Inc.*, 915 N.E.2d 536, 540 (Ind. Ct. App. 2009), *trans. denied*. In addressing whether a negative judgment is clearly erroneous, we consider only the evidence most favorable to the prevailing party and do not reweigh the evidence or judge the credibility of witnesses. *Id*. However, when a question of law is dispositive, we owe no deference to the trial court and review the issue *de novo*. *Id*. Where, as here, the trial court enters findings of fact and conclusions based thereon, we apply a two-tiered standard of review. *Troutwine Estates Dev. Co., LLC v. Comsub Design & Eng'g, Inc.*, 854 N.E.2d 890, 896 (Ind. Ct. App. 2006), *trans. denied*. First, we determine whether the evidence supports the findings, and then we determine whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous. *Id.* Findings are clearly erroneous if the record contains no facts or inferences supporting them, whereas a judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Indianapolis*

8

*City Market Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1021 (Ind. Ct. App. 2009) (citing *Garling v. Ind. Dep't of Natural Res.*, 756 N.E.2d 1029, 1032 (Ind. Ct. App. 2001), *trans. denied*).

## I. Standing to Enforce Restrictive Covenants

The judicial doctrine of standing focuses on whether the complaining party is the proper party to invoke the court's power. *Founds. of E. Chicago, Inc. v. City of E. Chicago,* 927 N.E.2d 900, 903 (Ind. 2010) (citing *State ex rel. Cittadine v. Ind. Dep't of Transp.*, 790 N.E.2d 978, 979 (Ind. 2003)), *clarified on reh'g*. Courts seek to assure that litigation will be actively and vigorously contested. *Id.* (citing *Schloss v. City of Indianapolis,* 553 N.E.2d 1204, 1206 (Ind. 1990)). "It is generally insufficient that a plaintiff merely has a general interest common to all members of the public." *Id.* (citing *Terre Haute Gas Corp. v. Johnson,* 221 Ind. 499, 45 N.E.2d 484 (1942)). "Standing requires that a party have 'a personal stake in the outcome of the lawsuit and must show that he or she has sustained or was in immediate danger of sustaining, some direct injury as a result of the conduct at issue.'" *Id.* (quoting *Higgins v. Hale,* 476 N.E.2d 95, 101 (Ind. 1985)).

Normally, "one not a party to a contract has no standing to enforce it." *City of Indianapolis v. Kahlo*, 938 N.E.2d 734, 741-42 (Ind. Ct. App. 2010) (citing *Gregory & Appel Ins. Agency v. Philadelphia Indem. Ins. Co.*, 835 N.E.2d 1053, 1058 n.7 (Ind. Ct. App. 2005), *trans. denied*), *trans. denied*. But a third party beneficiary of a contract has standing to enforce it. *Id.* For a contract to be enforceable by a third party,

9

it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed.

*Id*. (citing *Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006)).

The Paniaguas parties argue that the trial court's conclusion that they lacked standing to enforce the Restrictive Covenants against the Appellee Homeowners from Unit 2 because the Restrictive Covenants only applied to the homes in Unit 1 is erroneous because it runs contrary to Indiana law and is not supported by the evidence presented. They contend that the plain language of the Restrictive Covenants shows that they were intended to apply to both Unit 1 and Unit 2. The Paniaguas parties point to the language of the title of the Restrictive Covenants, which states, "Declaration of Restrictive Covenants of Fieldstone Crossing Subdivision, City of Crown Point, Lake County, Indiana," as evidence of this. *Pls.' Ex. 8, Ex. Vol. 7* at 1051. They likewise cite to the preamble of the Restrictive Covenants, which states in pertinent part: "We the undersigned, being each and all of the owners and developers of Fieldstone Crossing Subdivision . . . do hereby make, impose, and declare the following restrictions and covenants pertaining to the use, occupancy, construction, and development of the lands, lots, and improvements within said subdivision[.]" *Pls.' Ex. 8, Ex. Vol. 7* at 1051. The Paniaguas parties further assert that the Restrictive Covenants use the phrase "all lots" throughout the document without any reference to either Unit 1 or Unit 2 and that no

10

reasonable person would differ as to the meaning of such a phrase. The Paniaguas parties, therefore, allege that the trial court erroneously found an ambiguity where none existed and improperly considered extrinsic evidence of intent.

A restrictive covenant is an express contract between grantor and grantee that restrains the grantee's use of his land. *Villas W. II of Willowridge Homeowners Ass'n, Inc. v. McGlothin*, 885 N.E.2d 1274, 1278 (Ind. 2008) (citing *Holliday v. Crooked Creek Vills. Homeowners Ass'n, Inc.,* 759 N.E.2d 1088, 1092 (Ind. Ct. App. 2001)), *cert. denied*, 555 U.S. 1213 (2009). Restrictive covenants are used to maintain or enhance the value of land by reciprocal undertakings that restrain or regulate groups of properties. *Id*. Because covenants are a form of express contract, we apply the same rules of construction. *Drenter v. Duitz*, 883 N.E.2d 1194, 1199 (Ind. Ct. App. 2008). Construction of the terms of a written contract is a pure question of law for the court, and we conduct a de novo review of the trial court's conclusions in that regard. *Id*.

Indiana law permits restrictive covenants, but finds them disfavored and justified only to the extent they are unambiguous and enforcement is not adverse to public policy. *Id*. When courts are called upon to interpret restrictive covenants, they are to be strictly construed, and all doubts should be resolved in favor of the free use of property and against restrictions. *Id*. The covenanting parties' intent must be determined from the specific language used and from the situation of the parties when the covenant was made. *Id*. Specific words and phrases cannot be read exclusive of other contractual provisions. *Id*. In addition, the parties' intentions must be determined from the contract read in its entirety. *Id*. We attempt to construe contractual provisions so as to harmonize the

11

agreement and so as not to render any terms ineffective or meaningless.  *Id.*  However, where the intent of the parties cannot be determined within the four corners of the document, a factual determination is necessary to give effect to the parties' reasonable expectations.  *Renfro v. McGuyer*, 799 N.E.2d 544, 547 (Ind. Ct. App. 2003), *trans. denied*.

In the present case, the Restrictive Covenants state, in the preamble, that they pertain to the use, occupancy, construction, and development of the lots within the Fieldstone Crossing subdivision, and are entitled "Declaration of Restrictive Covenants of Fieldstone Crossing Subdivision . . . ."  *Pls.' Ex. 8, Ex. Vol. 7* at 1051.  However, they specifically provide, "The metes and bounds legal description of the Fieldstone Crossing Subdivision, and the land affected by these restrictions and covenants, is annexed hereto and made a part hereof as Exhibit 'A.'"  *Pls.' Ex.* 8, *Ex. Vol.* 7 at 1053.  Exhibit A to the Restrictive Covenants contains the legal description of Unit 1 and the plat drawing depicting Unit 1.  *Pls.' Ex.* 8, *Ex. Vol.* 7 at 1057-58.  The Restrictive Covenants do not state that they apply to Unit 2 or reference Unit 2 at all.  In fact, at the time that the Restrictive Covenants were filed, in 1993, Unit 2 had not even been platted.  The language of the Restrictive Covenants clearly states they only apply to Unit 1 of Fieldstone Crossing.

We likewise do not find the Paniaguas parties' arguments regarding the title and the use of the words "all lots" to be persuasive because the Restrictive Covenants state that Exhibit A is the "metes and bounds legal description of the Fieldstone Crossing Subdivision," and therefore, "all lots" refers only to the lots in Unit 1.  *Pls.' Ex.* 8, *Ex.*

12

*Vol.* 7 at 1053.  We conclude that the language in the Restrictive Covenants clearly and unambiguously states that they only apply to Unit 1 and not to Unit 2.  The trial court was correct in concluding that the Restrictive Covenants only applied to Unit 1 of Fieldstone Crossing and, therefore, the Paniaguas parties had no standing to enforce the Restrictive Covenants against the homeowners in Unit 2.[4]

## II.  Admission of Exhibits QQ through LLL

The standard of review for admissibility of evidence issues is abuse of discretion. *Fairfield Dev., Inc. v. Georgetown Woods Senior Apartments Ltd. P'ship*, 768 N.E.2d 463, 466 (Ind. Ct. App. 2002), *trans. denied*.  An abuse of discretion occurs only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court.  *Id*.  Even if a trial court errs in a ruling on the admissibility of evidence, this court will only reverse if the error is inconsistent with substantial justice. *Id*. at 466-67.

During the trial, the Appellee Homeowners offered into evidence Defendants' Exhibits QQ through LLL, which were minutes from the ACC while under the control of Endor that approved the construction of twenty-two Endor homes in Fieldstone Crossing. These exhibits were offered through the testimony of Dan Clark, Jr. ("Clark"), a homeowner who, along with others, formed a subsequent ACC after the last of the Endor homes had been built.  The Paniaguas parties objected to these exhibits, and the trial

---

[4] The Paniaguas parties also contend that, if the language of the Restrictive Covenants is found to be ambiguous, they still had standing to enforce them against the homeowners in Unit 2 because the evidence showed that Aldon had a common scheme of development for Fieldstone Crossing that all of the properties would be subject to the same restrictions.  Because we have not concluded that the language of the Restrictive Covenants is ambiguous, we do not reach this argument.

13

court ultimately admitted the exhibits under the business records exception to the hearsay rule. The trial court found that the exhibits were a record of a regularly conducted business activity, meeting minutes of the ACC, were properly authenticated, and were properly admitted through Clark, who was found to be qualified as a witness to authenticate the exhibits. *Appellants' App*. at 848-49.

The Paniaguas parties argue that the trial court abused its discretion when it admitted Defendants' Exhibits QQ through LLL under the business records exception to the hearsay rule because the documents lacked a proper foundation and were inherently untrustworthy. Without these documents, the Paniaguas parties assert that there was no evidence that the ACC properly approved construction of the Endor homes. The Paniaguas parties contend that Clark was not a proper witness to authenticate these exhibits because he was not a part of the ACC that approved the construction of the Endor homes, and his subsequently-formed ACC was not a continuation of the previous ACC as the current ACC did not include all thirty-seven properties as members.

Under Indiana Evidence Rule 803(6), evidence that is determined to be hearsay is not excluded by the hearsay rule if it is:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. The term "business" as used in this Rule includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

14

Ind. Evidence Rule 803(6). To admit business records pursuant to this exception, the proponent of the exhibit may authenticate it by calling a witness who has a functional understanding of the record keeping process of the business with respect to the specific entry, transaction, or declaration contained in the document. *Rolland v. State*, 851 N.E.2d 1042, 1045 (Ind. Ct. App. 2006). The witness need not have personally made or filed the record or have firsthand knowledge of the transaction represented by it in order to sponsor the exhibit. *Id*. Rather, such person need only show that the exhibit was part of certain records kept in the routine course of business and placed in the records by one who was authorized to do so and who had personal knowledge of the transaction represented at the time of entry. *Id.*

In the present case, Clark testified that he was a member of the current ACC, which was a continuation of the Endor ACC, and the current ACC assumed control after the Endor lots were sold and developed. *Tr*. at 976-77. Evidence was presented that Exhibits QQ through LLL originated from Endor when they were still a part of the litigation in response to a request for production from the Paniaguas parties. *Id*. at 986. Clark stated that, as a member of the ACC, he was familiar with how the records for the ACC are kept and that he believed that they were kept in the same fashion when the ACC was controlled by Endor. *Id*. at 979, 981. He further testified that it was the practice of the ACC to keep records for the approval of building homes, such as Exhibits QQ through LLL, in its regular course of business. *Id*. at 994. Clark also stated that the records appeared to be made by one with knowledge of the transactions contained in the

records and by someone who had the responsibility to do so and that they were created at, or around, the time of the transactions represented. *Id.* Although Clark did not personally make or file the records or have firsthand knowledge of the transaction represented in Exhibits QQ through LLL, this is not necessary to sponsor an exhibit and admit documents under the business records exception. *Rolland*, 851 N.E.2d at 1045. Based on the evidence presented, we conclude that the trial court did not abuse its discretion in admitting Exhibits QQ through LLL under the business records exception to the hearsay rule.

### III. Compliance with Restrictive Covenants

The Paniaguas parties argue that the evidence presented at trial did not support the trial court's finding that the ACC acted reasonably in deciding that the Endor-constructed homes complied with the Restrictive Covenants. They contend that, even if the ACC minutes are deemed to have been properly admitted, they only show that the ACC acted arbitrarily and unreasonably in approving the construction of the Endor homes. The Paniaguas parties further argue that the Restrictive Covenants clearly state that homes may not be built without the ACC's approval based on the "quality of workmanship and materials" and the "harmony of the proposed design with existing structures." *Pls.' Ex. 8, Ex. Vol.* 7 at 1051. They maintain that, because the agreement is to be read as a whole and viewed in light of the circumstances at the time the Restrictive Covenants were executed, the standard of quality of workmanship and materials and harmony of design that should have guided the ACC was that present in the existing structures at the time of construction of the first Endor home. The Paniaguas parties assert that, at that time, the

16

only structures existing were the Aldon homes, which all had common features of materials and design that are not present in the Endor homes.

We initially note that, consistent with our previous determination that the Restrictive Covenants did not apply to the homes in Unit 2, the Paniaguas parties' argument on this issue is confined to only the homes in Unit 1. In its judgment, the trial court stated the following:

> [T]he terms of the Restrictive Covenants are highly subjective, allowing for reasonable minds to differ on [what] will comply with them. Again, beauty is in the eye of the beholder, and the Restrictive Covenants make clear that the ACC is the only beholder whose opinion matters. The Court finds it to be of critical importance that the ACC took the time to review and approve the plans to build each of the Endor homes prior to their actually being built.

*Appellants' App*. at 118. The pertinent part of the Restrictive Covenants in the present case states:

> No home or structure shall be erected, placed or altered on any lot until construction plans and specifications and the plans showing the location of the structure have been approved by the Architectural Control Committee as to quality of workmanship and materials, harmony of external design with existing structures, and as to location with respect to topography and finish grade elevation.

*Pls.' Ex*. 8, *Ex. Vol*. 7 at 1051. Therefore, under the Restrictive Covenants, any proposed construction plans and specifications must be presented and the ACC must approve the proposed construction plans and specifications. In making the decision as to whether to approve the proposed construction and specifications, the Restrictive Covenants state that the ACC is to make its determination based on the "quality of workmanship and materials" as well as the "harmony of external design with existing structures." *Id*.

17

Although this is a subjective standard, the language of the Restrictive Covenants establishes that the determination of whether proposed construction and specifications meet this standard and whether to approve the proposed construction is solely the province of the ACC.

The evidence admitted at trial showed that the plans for the construction of the Endor homes in Unit 1 were presented to the ACC and that the ACC subsequently reviewed and approved the plans as evidenced in Exhibits QQ through LLL. At the time that the first proposed Endor home was presented to the ACC for approval, there were a total of nine homes existing in Fieldstone Crossing, including the homes of Paniaguas and the Cornetts. The ACC therefore had to take these nine pre-existing houses into consideration before deciding to approve the first Endor home; however, both the homes of Paniaguas and the Cornetts should not have been factored into the consideration as neither of their homes were built from the ABCD home models for Fieldstone Crossing. As approval was sought for subsequent Endor homes, the ACC would have necessarily taken into account all of the previous Endor homes as well as the Aldon homes. The evidence presented showed that the ACC took the time to review and approve the plans for the construction of the Endor homes prior to them being built, and we conclude that the evidence supported the trial court's finding that all of the homes built by Endor complied with the Restrictive Covenants.

### IV. Cross-Appeal

The Appellee Homeowners argue that the trial court abused its discretion in denying their request for attorney fees. The award of attorney fees is committed to the

sound discretion of the trial court, and we will reverse an award of attorney fees only upon a showing of an abuse of that discretion. *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

The Appellee Homeowners contend that the trial court should have granted their request for attorney fees because John Paniaguas, who is an accomplished patent attorney and a professional engineer, has continued to pursue this case against the Appellee Homeowners for "reasons other than to enforce the vague and ambiguous [Restrictive Covenants] on the neighborhood." *Appellees' Br.* at 40. They assert that, in light of the circumstances of this case, particularly John Paniaguas's legal knowledge, he should have known that this case was unreasonable, groundless, and frivolous, especially by the time it reached trial. They further claim that in light of the facts and circumstances, it can be reasonably concluded that Paniaguas has continued to litigate this matter in bad faith and for reasons beyond their prayer of relief. Therefore, the Appellee Homeowners argue that the trial court abused its discretion in denying them trial attorney fees, and they contend that this court should award appellate attorney fees. We disagree.

The Appellee Homeowners have not shown that the Paniaguas parties intended the filing of this case to be anything but an effort to vindicate their legal rights and, therefore, have not shown an abuse of process. We also conclude that the Appellee Homeowners have failed to present any evidence to show that the Paniaguas parties' claims were frivolous, unreasonable, or groundless. We therefore conclude that the Appellee Homeowners have not shown that the trial court abused its discretion in not awarding

19

attorney fees in their favor at trial. We likewise decline to award appellate attorney fees in favor of the Appellee Homeowners.

Affirmed.

VAIDIK, J., and PYLE, J., concur.